**SEATRAIN LINES, INC., Petitioner,**

v.

**FEDERAL MARITIME COMMISSION
and United States of America,
Respondents,**

**Pacific Far East Lines, Inc., Intervenor.**

**No. 71–1093.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 10, 1971.

Decided March 23, 1972.

---

Mr. Paul M. Tschirhart, Washington, D. C., with whom Mr. Marvin J. Coles, Washington, D. C., was on the brief, for petitioner.

Mr. Gordon M. Shaw, Atty., Federal Maritime Comm., of the bar of the Supreme Court of Illinois, *pro hac vice*, by special leave of court, with whom Messrs. James L. Pimper, Gen. Counsel, and Edward G. Gruis, Deputy Gen. Counsel, Federal Maritime Comm., were on the brief, for respondent Federal Maritime Comm.

Mr. Irwin A. Seibel, Atty., Dept. of Justice, for respondent United States.

Mr. Odell Kominers, Washington, D. C., with whom Mr. Stephen F. Eilperin, Washington, D. C., was on the brief, for intervenor.

Before BAZELON, Chief Judge, and MacKINNON and WILKEY, Circuit Judges.

WILKEY, Circuit Judge:

Whether the Federal Maritime Commission acted in accordance with its statutory mandate in approving Agreement No. 9903, calling for the acquisition of all the assets of one carrier by

water by another, is the principal issue presented for review. Whether the Commission had jurisdiction to act is necessarily the seminal question; the answer we reach here pretermits all other issues.

Our answer is not reached without difficulty. In addition to the expected divergent views of the private parties, we find the Federal Maritime Commission and the Department of Justice (representing the statutory respondent United States) on opposite sides of the jurisdictional issue. And, as we shall see later, the four United States judges who have considered the question have divided evenly. For the reasons set forth below, which to us seem persuasive, we hold the Commission here lacks the requisite jurisdiction.

I. *The Agreement, the Statute, and the Issue*

Seatrain Lines, Inc., petitions for review and reversal of the Federal Maritime Commission's approval without a hearing of Agreement No. 9903 between Pacific Far East Line, Inc., and Oceanic Steamship Company, covering the sale by Oceanic of its entire fleet of four vessels, currently in service in the North American Pacific Coast-Australasian Trade (Trade Route 27), as well as Oceanic's interest in two container ships still building in the United States with the aid of construction-differential subsidy. Included in the sale of these assets are transfers of Oceanic personnel and all shoreside equipment to Pacific Far East Line. This sale comprises all of Oceanic's assets, although Oceanic, a wholly-owned subsidiary of the Matson Navigation Company, retains its corporate existence and is not restricted by the agreement from re-entering the North American Pacific Coast-Australasian or any other trade.

The question presented at the outset is whether this agreement falls within the scope of the Commission's [1] jurisdic-

1. The "Commission" refers to the Federal Maritime Commission [75 Stat. 840

(1961)] and its predecessors, the United States Shipping Board [39 Stat. 728,

tion as defined by the Shipping Act of 1916.[2] As enacted, Section 15 of the Act provided in relevant part as follows:

> That every common carrier by water, or other person subject to this Act, shall file immediately with the board [now the Commission] a true copy, or, if oral, a true and complete memorandum, of every agreement with another such carrier or other person subject to this Act, or modification or cancellation thereof, to which it may be a party or conform in whole or in part,
>
> ■ fixing or regulating transportation rates or fares;
>
> ■ giving or receiving special rates, accommodations, or other special privileges or advantages;
>
> ■ controlling, regulating, preventing, or destroying competition;
>
> ■ pooling or apportioning earnings, losses, or traffic;
>
> ■ allotting ports or restricting or otherwise regulating the number and character of sailings between ports;
>
> ■ limiting or regulating in any way the volume or character of freight or passenger traffic to be carried;
>
> ■ or in any manner providing for an exclusive, preferential, or co-operative working arrangement.

The term "agreement" in this section includes understandings, conferences, and other arrangements.

> The Board [now the Commission] may by order disapprove, cancel, or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between . . .

> Agreements existing at the time of the organization of the Board [now the Commission] shall be lawful until disapproved by the Board. . . .
>
> . . . Every agreement, modification, or cancellation lawful under this section shall be excepted from the provisions of the Act approved July 2, 1890, entitled "An Act to protect trade and commerce against unlawful restraints and monopolies", and amendments and Acts supplementary thereto, and the provisions of sections 73 to 77, both inclusive, of the Act approved August 27, 1894, entitled "An Act to reduce taxation, to provide revenue for the Government, and for other purposes", and amendments and Acts supplementary thereto.[3]

While the agreement here at issue may at first impression be thought to fall within the third category—"controlling, regulating, preventing, or destroying competition"—inasmuch as the sale by Oceanic to Pacific Far East Line of all of its assets has the effect of eliminating Oceanic, at least for the present, from the North American Pacific Coast-Australasian trade, both the language and context of Section 15 itself and the legislative history accompanying it demonstrate that this particular agreement is not covered.

## II. The Statute's Treatment of Antitrust Considerations

### A. Specific Language of Section 15.

The language of Section 15 is concerned with the implementation of "agreements," which definitely "includes understandings, conferences, and other arrangements," among common carriers by water. The first six categories specified in Section 15 refer to agreements which of necessity imply the continued existence of the parties and their par-

729, 733 (1916)]; the United States Shipping Board Bureau of the Department of Commerce [Exec. Order No. 6166, § 12 (1933)]; the United States Maritime Commission [49 Stat. 1985 (1936)]; and the Federal Maritime Board [64 Stat. 1273 (1950)].

2. 7 Sept. 1916, Ch. 451, § 1, 39 Stat. 728, as amended 46 U.S.C. §§ 801–842.

3. *Id.* § 814, as amended 3 Oct. 1961, Pub. L. 87–346, § 2, 75 Stat. 763; 29 Feb. 1964, Pub.L. 88–275, 78 Stat. 148.

ticipation in such agreements over time (*e. g.*, fixing or regulating rates; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting sailings between ports, etc.). In the case at bar, however, Oceanic is eliminated from the North American Pacific Coast-Australasian trade (as well as any others), at least until it decides to re-enter the trade by acquiring vessels and related personnel and equipment. The seventh category is intended merely to summarize the type of agreements covered—those "in any manner providing for an exclusive, preferential, or cooperative *working* arrangement"; [4] and not to include those of an entirely different nature, such as involved here—the acquisition of all the assets of one common carrier by water by another—which can hardly be considered mere "working arrangements."

This view is supported by the language in the second and third paragraph, immediately following paragraph one, in Section 15. The second paragraph authorizes the Commission to disapprove, cancel or modify any agreement "whether or not previously approved" by it which it finds to be unjustly discriminatory. The third paragraph in Section 15 declares existing agreements lawful "until disapproved by the Com-

mission." Both of these paragraphs of Section 15 undeniably envision agreements which are amenable to continuing Commission supervision. If changing conditions warrant it, the Commission may find a working arrangement hitherto not considered unfair to be unjustly discriminatory, and thus order its dissolution or modification. In the case of arrangements of a more permanent nature such as here involved, the sale of all the assets of one common carrier by water to another, subsequent Commission cancellation or modification of such a previously approved arrangement would be very difficult if not impossible to implement. The whole structure of Section 15, not only the first paragraph listing the type agreement covered, shows an intent to grant the Commission authority to deal with agreements of a continuing nature.[5]

**B. *Standards By Which the Statute Is Construed.***

Aside from the specific language of Section 15, a contrary reading of its scope regarding agreements covered is likewise not warranted in view of the fundamental import of the nation's antitrust policies, expressed by Congress in a variety of legislative enactments, primarily the Sherman Act.[6] The Supreme

---

4. *Id.* (emphasis added). Our interpretation of the seventh category of Section 15 parallels that of the Supreme Court in Federal Maritime Board v. Isbrandtsen Co., 356 U.S. 481, 78 S.Ct. 851, 2 L.Ed. 2d 926 (1958), with respect to the fourth category of Section 14 of the Shipping Act. The Court, after discussing the specific prohibitions of the first three categories of Section 14, made this analysis:

 Therefore, coordinate with these three clauses aimed at specific practices, a fourth category, couched in general language, was added: "resort to other discriminating or unfair methods. . . ." In the context of § 14 this clause must be construed as constituting a *catchall* clause by which Congress meant to prohibit other devices not specifically enumerated but *similar in purpose and effect* to those barred by § 14, First, Second, and the "retaliate" clause of § 14 Third.

(*Id.*, at 492, 78 S.Ct., at 858 (emphasis added)).

5. This view is also supported by a contemporary comment on the type of agreements covered by the newly-enacted Section 15 of the Shipping Act of 1916: "Perhaps the most important of these [provisions of the Act] is § 15, which exempts from the operation of the antitrust laws pooling, rate, and other *cooperative* agreements, which have been filed with and approved by the Board [now the Commission]." "Current Legislation—Government Regulation of Private Shipping," 17 Colum.L.R. 357, 358 (1917) (emphasis added).

6. 15 U.S.C. §§ 1–7, as amended 17 Aug. 1937, Ch. 690, Title VIII, 50 Stat. 693; 7 July 1955, Ch. 281, 69 Stat. 282. While Section 7 of the Clayton Act, 15 U.S.C. § 18, as amended 29 Dec. 1950, Ch. 1184, 64 Stat. 1125, prohibiting the acqui-

Court has "long recognized that the antitrust laws represent a fundamental national economic policy . . ."[7] and stated that "[r]epeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, and have only been found in cases of plain repugnancy between the antitrust and regulatory provisions."[8] Even where Congress has granted exemptions from the antitrust laws, the Court has held that it is "bound to construe them strictly, since . . . [they are] restrictive of a free economy."[9] With specific reference to situations such as that presented by the case at bar, the Court has stated that it "cannot lightly assume that the enactment of a special regulatory scheme for particular aspects of an industry was intended to render the more general provisions of the antitrust laws wholly inapplicable to that industry."[10]

This court has recently applied this principle, and in so doing observed:

. . . [T]he basic philosophy of our antitrust policy has been so long established, is of such recognized economic importance, and has assumed in the statutory scheme of

things such high dignity that a contrary congressional intent or "immunity from the antitrust laws 'is not lightly implied.'"

. . . [T]he proper inquiry [in cases such as this one] would seem to be to what extent Congress has knowingly adopted a policy contrary to or inconsistent with the previously established antitrust laws. . . .

Putting the problem in this light, relevant criteria would include the specific language of the congressional statute involved, any legislative history which would throw light on the congressional intent, the relative importance of the governmental action which is asserted to override antitrust policy, whether the governmental agency is required to take into consideration the possible anticompetitive effect of its actions, whether the agency is required to adhere to a clearly defined and restricted statutory directive, and to what extent the agency's actions are subject to judicial review.[11]

In the same case, this court, in considering federal government regulation of

---

sition by one corporation of the stock or assets of another where it tends substantially to lessen competition or to create a monopoly, states that "[n]othing contained in this section shall apply to transactions duly consummated pursuant to authority given by the . . . United States Maritime Commission [now the Federal Maritime Commission] . . . under any statutory provision vesting such power in such Commission . . .," the Supreme Court held that "[t]he words 'transactions duly consummated pursuant to authority' given [the Commission] 'under any statutory provision vesting such power' in it are plainly not a grant of power to adjudicate antitrust issues," since Congress did not intend in Section 7 to confer on any agency mentioned therein "any authority or powers which it does not already possess." California v. Federal Power Commission, 369 U.S. 482, 486, 82 S.Ct. 901, 904, 8 L.Ed.2d 54 (1962).

7. Carnation Co. v. Pacific Westbound Conference, 383 U.S. 213, 218, 86 S.Ct. 781, 784, 15 L.Ed.2d 709 (1966). In view of

the Court's holding in *Carnation* that agreements unapproved by the FMC are beyond the immunity afforded by the Shipping Act (383 U.S. at 224, 86 S.Ct. 781), then obviously agreements not within the authority of the FMC to approve are beyond the immunity offered by the Shipping Act as well. See Comment, "Accommodations of Antitrust Law and Ocean Shipping Regulation," 4 Texas Int'l L. Forum 393, 405 (1968).

8. United States v. Philadelphia National Bank, 374 U.S. 321, 350–351, 83 S.Ct. 1715, 1734–1735, 10 L.Ed.2d 915 (1963) (footnotes omitted).

9. United States v. McKesson & Robbins, 351 U.S. 305, 316, 76 S.Ct. 937, 943, 100 L.Ed.2d 1209 (1956).

10. Carnation Co. v. Pacific Westbound Conference, 383 U.S., at 218, 86 S.Ct. 781, 784, 15 L.Ed.2d 709.

11. Hecht v. Pro-Football, Inc., 144 U.S. App.D.C. 56, 444 F.2d 931, 935 (1971) (footnotes omitted), cert. denied 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed. 736 (1972).

business, stated with specific reference to the scope of the Federal Maritime Commission's authority to grant exemptions from the antitrust laws:

> The maritime industry operates under the power of the Federal Maritime Commission specifically to grant exemptions from the antitrust laws. This power is not to be exercised loosely, hence in Federal Maritime Commission v. Aktiebolaget Svenska Amerika Linien (Swedish American Line) [390 U.S. 238, 88 S.Ct. 1005, 19 L.Ed.2d 1071] the [Supreme] Court upheld the Commission regulation that shipping "conference restraints which interfere with the policies of the antitrust laws will be approved *only* [emphasis in original] if" the conferences can show that they are "required by a serious transportation need, necessary to secure important public benefits *or in furtherance of a valid regulatory purpose of the Shipping Act.*" [12] (Emphasis added.)

### C. *Language of Contemporary Statutes.*

As the Supreme Court has recognized in regard to exemptions from the antitrust laws, "[i]f Congress had desired to grant any further immunity, Congress doubtless would have said so." [13] This view is supported by an examination of two contemporary statutes of the Shipping Act: Enacted in 1912, the Panama Canal Act in amending Section 5 of the Interstate Commerce Act dealt specifically with interlocking ownership or control of common carriers by water by making it unlawful for any railroad "to own, . . . control, or have any interest whatsoever (by stock ownership or otherwise, either directly, indirectly, through any holding company, or by stockholders or directors in common, or in any other manner) in any common carrier by water operated through the Panama Canal or elsewhere" with which the railroad may compete; [14] enacted in 1914, Section 7 of the Clayton Act speaks in terms of the "acquisition by one corporation of the [whole or any part of the] stock of another" and is directed at controlling corporate mergers. [15]

It is highly unlikely, in view of this specific statutory treatment by Congress of the antitrust implications of acquisitions of corporate control, that Congress originally intended to exempt such acquisitions under Section 15 of the Shipping Act by making no specific reference to them but simply by including them under the rubric "agreement." On the contrary, the silence of Congress in Section 15 with respect to the subject of acquisition of control or ownership can only be taken to mean that Congress had no intention by the Shipping Act of 1916 to exempt such arrangements from the normal administration of the antitrust laws. The Federal Maritime Commission's attempt to derive a contrary affirmative intent on the part of Congress from its silence is not a favored method of statutory interpretation. [16]

It would therefore be illogical to read the language of Section 15 as applying to agreements other than those which provide for "exclusive, preferential, or working arrangements," since to do so would be to change the clear intent of Congress as to the usual standards and responsibility for administration of the antitrust laws without specific language so requiring. This is by no means intended to denigrate the functions of the Federal Maritime Commission with respect to cooperative working agreements

---

12. *Id.*, at 943 (footnotes omitted).

13. United States v. Borden Co., 308 U.S. 188, 201, 60 S.Ct. 182, 189–190, 84 L.Ed. 181 (1939) ; see also Hecht v. Pro-Football, Inc., *supra*, note 11.

14. 24 Aug. 1912, Ch. 390, § 11, 37 Stat. 566, 49 U.S.C. § 5(14).

15. 15 Oct. 1914, Ch. 323, § 7, 38 Stat. 731, 15 U.S.C. § 18.

16. Cleveland v United States, 329 U.S. 14, 23–24, 67 S.Ct. 13, 91 L.Ed. 12 (concurring opinion) (1946), and cases cited therein ; United States v. R. J. Reynolds Tobacco Co., D.C., 325 F.Supp. 656, 662 (1971).

among common carriers by water: rather it is designed simply to delineate the appropriate scope for such functions in light of other significant national concerns, here the antitrust laws.

On the face of the statute, the language of Section 15 does not vest the Commission with jurisdiction over the type of agreement here at issue—the acquisition of all the assets of one common carrier by water by another carrier. This is not to say, or imply, that this agreement must therefore of necessity be considered void as violative of the antitrust laws. Whether it should be considered valid or invalid is a matter for evaluation first by the appropriate antitrust enforcement agency, and subsequently if a dispute arises by the courts.

III. *The Legislative History of the Shipping Act of 1916*

A. *Congressional Action 1914 to 1916.*

Besides the specific language of Section 15 itself, the legislative history accompanying the Shipping Act of 1916 lends support to the view that Congress did not intend to vest the Federal Maritime Commission with jurisdiction over the type of agreement involved in the case at bar. The work of the House Committee on the Merchant Marine and Fisheries of the 63d Congress, under the direction of its Chairman, Representative J. W. Alexander, formed the basis for the enactment of the Shipping Act. As the Supreme Court described it, "[this Committee] undertook an exhaustive inquiry into the practices of *shipping conferences*. The work of this Committee is set forth in two volumes

of hearings, a volume of diplomatic and consular reports, and a fourth volume containing the Committee's report, known as the Alexander Report." [17] The Alexander Report includes a questionnaire sent to the steamship lines engaged in the American foreign trade, inquiring into cooperative working arrangements with other lines and railroads.[18] As the Report itself summarizes:

> The facts contained in the foregoing report show that it is almost universal practice for steamship lines engaging in the American foreign trade to operate, both on the in-bound and outbound voyages, under the terms of written agreements, conference arrangements, or gentlemen's understandings, which have for their principal purpose the regulation of competition through either (1) the fixing or regulating of rates, (2) the apportionment of traffic by allotting the ports of sailing, restricting the number of sailings, or limiting the volume of freight which certain lines may carry, (3) the pooling of earnings from all or a portion of the traffic, or (4) meeting the competition of non-conference lines. Eighty such agreements or understandings, involving practically all the regular steamship lines operating on nearly every American foreign trade route, are described in the foregoing report. . . . The report also presents the economic advantages and disadvantages of steamship agreements and conference arrangements as presented to the Committee by steamship line representatives and the exporting and importing interests of the United States . . . .[19]

17. Federal Maritime Board v. Isbrandtsen Company, Inc., 356 U.S. 481, 488, 78 S.Ct. 851, 856, 2 L.Ed.2d 926 (1958) (footnotes omitted) (emphasis added), citing to House Committee on the Merchant Marine and Fisheries, Report on Steamship Agreements and Affiliations in the American Foreign and Domestic Trade, H.Doc.No.805, 63d Cong., 2d Sess. (1914).

18. House Committee on the Merchant Marine and Fisheries, Report on Steamship Agreements and Affiliations in the American Foreign and Domestic Trade, H.Doc. No. 805, 63d Cong., 2d Sess. 13–14 (1914).

19. *Id.*, at 415.
   As Judge Garth noted with respect to the subject of the Committee's inquiry:

As the foregoing indicates, the subject of the Committee's investigations was "agreements, conference arrangements, [and] gentlemen's understandings," all of which envision the continued existence of the parties and their participation in such agreements (*e. g.,* in fixing rates, apportioning traffic, pooling earnings, etc.).[20] There is no intention on the part of the Committee to include, nor is there any language in fact so including, the type of arrangements involved in the case at bar—the acquisition of *all* the assets of one steamship line by another. The Committee employed terms other than the word "agreement" to refer to transactions not of a continuing nature:

> The numerous methods of controlling competition between water carriers in the domestic trade, referred to in the preceding pages, may be grouped under three headings, viz., (1) control through *acquisition* of water lines or the *ownership* of accessories to the lines; (2) control through agreements or understandings; and (3) control through special practices.[21]

It would be superfluous, then, for the Committee to have made this distinction if the Commission were correct in asserting that the Committee used the term "agreement" to encompass transactions other than those constituting cooperative working arrangements.[22]

The Committee recommended against a complete prohibition of cooperative working arrangements among steamship lines since it found that, in the absence of such agreements, rate wars would occur which would have the ultimate effect of eliminating the weaker lines through failure or consolidation.[23]

---

The catalog or "full classification of these agreements" (i. e., the "agreements" to which the Alexander Committee's attention was primarily directed and to which its recommendations were exclusively directed) does not include a single agreement of merger or other form of corporate reorganization. The "agreements" represented in the Report are all "on-going" in nature. Most of these "agreements" are cooperative working arrangements. These "agreements" describe practices or regular activities in which two or more shipping companies have agreed to participate over a considerable period of time. None of the "agreements" studied by the Alexander Committee bears the slightest resemblance to an agreement of merger, which is essentially *a single, discrete event,* which transforms the relationship of the merging parties at the instant of merger.

United States v. R. J. Reynolds Tobacco Company, D.C., 325 F.Supp. 656, 658–659 (1971) (emphasis added).

20. *Id.*

21. *Id.,* at 409. (emphasis in original).

22. See United States v. R. J. Reynolds Tobacco Co, *supra,* note 19.

23. The Committee recommended:
> (2) That all carriers engaged in the foreign trade of the United States, parties to any agreements, understandings, or conference arrangements hereinafter referred to, be required to file for approval with the Interstate Commerce Commission a copy of all written agreements (or a complete memorandum if the understanding or agreement is oral) entered into (1) with any other steamship companies, firms, or lines engaged directly or indirectly in the American trade, or (2) with American shippers, railroads or other transportation agencies. . . .

Alexander Report, *supra,* note 18, at 419–20.

As the Committee noted:
> Most of the numerous agreements and conference arrangements discussed in the foregoing report were the outcome of rate wars, and represent a truce between the contending lines. To terminate existing agreements would necessarily bring about one of two results: the lines would either engage in rate wars which would mean the elimination of the weak and the survival of the strong, or, to avoid a costly struggle, they would consolidate through common ownership . . . . [E]ither would mean a monopoly fully as effective, and it is believed more so, than can exist by virtue of an agreement.

*Id.,* at 416.

The Committee also found that prohibiting such working agreements among steamship lines
> . . . would not only involve a wholesale disturbance of existing conditions

In order to forestall the outbreak of rate wars, the Committee concluded that "the several [steamship] lines in any given trade [should be permitted] to cooperate through some form of rate and pooling arrangement under Government supervision and control."[24] The Committee went on, however, to find that "[w]hile admitting their many advantages, the Committee is not disposed to recognize steamship agreements and conferences, unless the same are brought under some form of effective government supervision."[25] To this end, it urged, *inter alia*, that parties to such agreements be required to file for approval with the appropriate governmental authorities a copy of all agreements with other lines engaged directly or indirectly in the American trade or with American shippers, railroads or other transportation agencies.[26]

The clear tenor of the Committee's analysis, the problems it faced and the solution it proposed, all related to agreements of a continuing nature. Section 15 embodied the Committee's solution; the "arrangements" it had considered were to be placed under government "supervision and control." The Committee had neither sought information nor had discussion on ship sale agreements.

They were neither part of the problem nor part of the solution.

■ Congress, in enacting the Shipping Act of 1916, followed the basic recommendations of the House Committee on the Merchant Marine and Fisheries as contained in the Alexander Report.[27] It is clear, then, that Congress intended to tolerate only the minimum anticompetitive behavior necessary to preserve an essentially competitive structure in the maritime industry by striving to avoid either the failure or consolidation of independent steamship lines by the method of government supervision of anticompetitive working arrangements. While Congress recognized that in order to accomplish this result a measure of competition might have to be sacrificed, such as permitting agreement on rates or pooling of earnings, it did not intend thereby to remove all effective competition or to have those agreements permitted under Section 15 of the Shipping Act be considered as permanent in every instance. Congress preserved ample room for competition in a variety of areas other than rates, especially those which relate to the quality of service provided by the various steamship lines.[28] Congress also provided that

in the shipping business but would deprive American exporters and importers of the advantages claimed as resulting from agreements and conferences if *honestly and fairly conducted*, such as greater regularity and frequency of service, stability and uniformity of rates, economy in the cost of service, better distribution of sailings, maintenance of American and European rates to foreign markets on a parity, and equal treatment of shippers through the elimination of secret arrangements and underhanded methods of discrimination. . . . *Id.*

24. See note 18, *supra*, at 416.

25. *Id.*

26. *Id.*, at 419–20.

27. As the Court in Federal Maritime Board v. Isbrandtsen Company, Inc., *supra*, noted "[t]he Alexander Report was submitted in 1914 to the 63d Congress and a bill to carry out its recommendations was

introduced but not passed. H.R. 17328, 63d Cong., 2d Sess. In the following Congress substantially the same bill was reintroduced H.R. 15455, 64th Cong., 1st Sess., and became the Shipping Act of 1916." 356 U.S., at 490, n. 11, 78 S.Ct. at 857.

28. The following indicates the range of non-price competition:

If we assume, theoretically, that the members of a conference adhere strictly to their agreement, then they must compete with each other on a so-called nonprice basis. Better service would appear to be the principal inducement to offer to shippers in an effort to obtain their patronage. This means offering faster, more convenient schedules, and special facilities for cargo handling—*e. g.*, refrigerated space. However, even speed may be ruled out as a competitive factor. In some conferences, rates have been geared to speed—the slower the vessel the lower the rates. Actually com-

the agreements permitted under Section 15, none of which are invariably permanent, may be cancelled or modified by the Commission in the event changing circumstances warrant.

### B. *Congressional Action or Non-Action Since 1916.*

The Commission contends that Congress has indicated by its actions *subsequent* to the enactment of the Shipping Act in 1916 that Section 15 provides the FMC with authority to approve, and thereby exempt from the antitrust laws, not only agreements of a continuing nature but also those such as presented by the case at bar—a sale of all assets of one common carrier by water to another.

In support of this assertion the Commission points first to the 1950 amendment of Section 7 of the Clayton Act. Section 7, which prohibits the acquisition by one corporation of the stock or assets of another where it tends substantially to lessen competition or to create a monopoly, provides:

Nothing contained in this section shall apply to transactions duly consummated pursuant to authority given by the . . . [listing various regulatory agencies] . . . United States [now Federal] Maritime Commission . . . under any statutory provision vesting such power in such Commission, Secretary, or Board.[29]

The Commission then refers to the legislative history accompanying the 1950 amendment of Section 7, in which the Senate Committee on the Judiciary stated: "The purpose of the amendments is to include in the bill the recommendations of the United States [now Federal] Maritime Commission [to the effect that transactions duly consummated pursuant to the Commission's authority are exempted from the bill] . . . ."[30] The FMC neglects to add, however, that the Senate Report noted that the proposed bill then before the Senate differed from the bill as passed by the House in the following manner:

. . . (2) The Maritime Commission, at its request has been included in the category of agencies to which the act does not apply when transactions are duly consummated pursuant to authority given to that Commission. *In making this addition, however, it is not intended that the Maritime Commission, or, for that matter, any other agency included in this category, shall be granted any authority or powers which it does not already possess.*[31]

The Commission's argument that Congress would not have included the FMC in the exemption provision in the 1950 amendment of Section 7,[32] if the Commission had no authority whatever with respect to acquisitions, is a bootstrap attempt to derive a positive statutory grant of authority from what is merely a list of agencies whose then-existing authority Congress did not intend to affect, either affirmatively or negatively. That effort has been rebuffed in ad-

---

petition often goes beyond these theoretical confines. Violations of agreements occur and competition intrudes on rates. The abuses will persist so long as they are not flagrant or discovered by disadvantaged "clean" competitors. Such "shadings" of the rules are difficult to eliminate in an arrangement based on self-interest but calling for self-discipline. Competition among conference members is often intense, depending upon conditions in the trade. Gorder, United States Shipping Policy, 146 (1956) (footnote omitted) ; see also Marx, International Shipping Conferences, 250–251 (1953).

29. 15 U.S.C. § 18, as amended 29 Dec. 1950, Ch. 1184, 64 Stat. 1125.

30. S.Rep. No. 1775 (to accompany H.R. 2734), 81st Cong., 2d Sess. (1950), 2, U.S. Code Cong.Serv., p. 4293, in which the Senate Judiciary Committee repeats in substance H.R.Rep. No. 1191 (to accompany H.R. 2734), 81st Cong., 2d Sess. (1949).

31. *Id.,* S.Rep. No. 1775, at 7, U.S.Code Cong.Serv., p. 4300 (emphasis added).

32. Brief in Reply for Respondent, Federal Maritime Commission, p. 11.

vance by the Supreme Court: "The words 'transactions duly consummated pursuant to authority' given [the Commission] 'under any statutory provision vesting such power' in it are plainly not a grant of power to adjudicate antitrust issues," since Congress did not intend by Section 7 to confer on any agency mentioned therein " 'any authority or powers which it does not already possess.' " [33]

Of course, as we have made amply clear above, the Commission *does* have authority in regard to some types of transactions which otherwise would run afoul of the antitrust laws. The whole purpose of this opinion is to determine whether this particular transaction—a sale of all ships and assets—was the *type transaction* to which *authority* has been *given* to the Commission to pass on. The logic of our analysis is not aided by reference to congressional action which *explicitly and only* recognized authority of the Commission previously granted—and no more.

The Commission's attempt to discover an affirmative grant of power by Congress in the context of the 1956 hearings on proposed legislation affecting corporate mergers is equally unpersua-

sive. The FMC points to the statement of the Chairman of the maritime regulatory agency to the Acting Chairman of the Senate Subcommittee on Antitrust and Monopoly to the effect that "merger agreements approved by the Board [now the Commission] under Section 15 . . ., and the resulting mergers are exempt from Section 7 [of the Clayton Act]." [34] The FMC then concludes that, since "no view to the contrary was expressed by any subcommittee or other Senate member at that time," [35] Congress must have intended Section 15 to encompass mergers as well as agreements of a continuing nature. It would be illuminating in this regard to examine all of the statements from various administrative agencies which were filed with the subcommittee and left uncontradicted by the committee or by Congress. The volume of law inferentially approved by Congress in this manner would probably be enormous.

The third legislative action cited by the Commission is the 1962 investigation by the Antitrust Subcommittee of the House Committee on the Judiciary into the ocean freight industry. The Subcommittee's Report (the Celler Report) describes a merger of two shipping

---

33. California v. Federal Power Commission, 369 U.S. 482, 486, 82 S.Ct. 901, 904, 8 L.Ed.2d 54 (1962). That the FMC itself was aware of Congress' intent with respect to Section 7 is evident from the letter of the Commission's Vice Chairman to the Chairman of the Senate Judiciary Subcommittee to Consider H.R. 2734, in which he states:

It does *not appear that the provisions of H.R. 2734 are intended directly or indirectly to affect the above-quoted exemption from the Anti-Trust Laws provided in section 15 of the Shipping Act.* However, in view of the fact that the bill contains provisions specifically recognizing an exemption in respect of transactions approved by specified agencies under statutory authority, the Commission believes that the section in question should be amended to exempt from section 7 of the Clayton Act, as proposed to be amended by the bill, the transactions approved pursuant to authority given by the Maritime Commission under statutory authority such as

the aforesaid section 15 of the Shipping Act, 1916. This would avoid undesirable controversy which is likely to arise from any contention that the failure to include the Maritime Commission among the agencies specifically mentioned makes agreements approved by the Commission . . . subject to provisions of section 7 of the Clayton Act.

Reply Brief for Respondent, Federal Maritime Commission, Appendix, p. 2, quoting excerpt from Letter from the United States Maritime Commission Vice Chairman, dated 29 Sept. 1949, filed in National Archives under title "H.R. 2734 accompanying papers, Senate Committee on the Judiciary, 81st Cong." (emphasis added).

34. Hearings on Legislation Affecting Corporate Mergers Before the Subcommittee on Antitrust and Monopoly of the Senate Committee on the Judiciary, 84th Cong., 2d Sess. 527 (1956).

35. Reply Brief, *supra*, note 32 at 12.

firms, American Export Lines and Isbrandtsen Co., Inc., and its subsidiary, Isbrandtsen Steamship Co., as "an agreement recently approved by the Maritime Commission" [36] and notes "the word 'agreement' in the [Shipping] act is defined broadly so as to encompass all 'understandings, conferences and other arrangements.' " [37] The Commission's effort to deduce that the Subcommittee thereby agreed with the Commission that the latter possesses the authority to approve "acquisition agreements," nowhere specifically mentioned in the Celler Report, and to exempt such agreements from Section 7 of the Clayton Act, is no more convincing than its interpretation of the events (or nonevents) of 1950 and 1956. In fact, the Celler Report, in summarizing its approach to Section 15, reveals one type of agreement which it had in mind:

It is clear to the subcommittee that the language in Section 15 defining agreements that must be filed should not be modified in any respect. It appears that one of the Board's [now the Commission's] principal motives for requesting legislative "clarification" was to divest itself of statutory authority which could be invoked by an energetic agency at some future time to require filing and approval of *conference rate schedules.*[38]

All that the congressional action since 1916 cited to us by the Commission reveals is that the Commission has indulged in some wishful thinking in regard to its own jurisdiction over certain type contracts, which raise antitrust questions but which are not specifically included within Section 15, yet Congress has never acted to transform those daydreams into the concrete reality of statute.

IV. *Administrative and Judicial Construction of Section 15 of the Shipping Act of 1916*

A. *Action by the Commission.*

The Commission asserts that when confronted with transactions such as presented by the case at bar which "affect competition, whether by sale or merger," it has held that they are subject to the requirements of Section 15. However, investigation of the cases cited by the Commission in support of this assertion reveals that in each instance the transaction at issue was one of a continuing nature calling for the supervision of the Commission, not a single transaction such as a sale of ships with no restrictions governing their subsequent use.[39] The Commission has not

36. Antitrust Subcommittee of the House Commitee on the Judiciary, Report on the Ocean Freight Industry, 87th Cong., 2d Sess. 47 (1962).

37. *Id.,* at 331.

38. *Id.,* at 335 (footnote omitted) (emphasis added).

39. The first case advanced by the FMC, New York and Porto Rican S.S. Co.— Waterman S.S. Corp. Agreement (2 U.S. M.C. 453 (1940)), involved a sale of good will by one common carrier by water to another, together with an agreement not to compete in the Gulf of Mexico-Puerto Rico service for a period of ten years. In view of the latter provision, the Commission found the transaction to be one which "controls, regulates, prevents, and destroys competition in the Puerto Rican trade" and that it was therefore subject to FMC jurisdiction under Section 15. The situ-

ation presented by the case at bar, however, involves simply a sale by Oceanic of its fleet of four vessels and its interest in two containerships, together with a transfer of related personnel and shoreside equipment, to Pacific Far East Line. Oceanic retains its corporate existence and is free to re-enter the North American Pacific Coast-Australasian or any other trade at any time.

The second case cited by the Commission is Agreements 8745 and 8745-1, Purchase of Vessels "Alicia" and "Dorothy" (7 F.M.C. 199 (1962)), which involved a sale of two vessels and an agreement on the part of the seller not to compete with the buyer in the Gulf of Mexico-Puerto Rico trade for a period of one year. As such, the Commission found the sale to be one which "regulates, prevents, and destroys competition" and therefore subject to the FMC's jurisdiction under Section

prior to this time asserted jurisdiction over a simple ship sale where the agreement does not limit competition between the parties, either by a merger or by a

15. The Commission underscores the fact that in that case it requested and received the views of, *inter alia*, the Antitrust Division of the Department of Justice on the proposed sale, indicating that the Antitrust Division had no objection to FMC approval of the transaction. If the Commission believes that because there is a sale of vessels involved in the case at bar as well, that should suffice to give the FMC jurisdiction under Section 15, it fails to recognize the significant difference between the two cases: In *Agreements 8745 and 8745-1*, in addition to the sale of vessels, there was a covenant not to compete for one year, which clearly "controls, regulates, prevents, and destroys competition"; in the case at bar, however, there is a simple sale of ships, with no such continuing restrictions imposed upon or agreed to by Oceanic.

Agreement No. 8555 Between Isbrandtsen S.S. Co., Isbrandtsen Co., Inc., and American Export Lines, Inc. (7 F.M.C. 125 (1962)), the third case cited by the Commission, involved a sale by Isbrandtsen of its liner fleet of fourteen vessels and its entire business, including good will, to American Export, as well as agreeing not to compete in the services transferred without American Export's consent. There is no such agreement "controlling, regulating, preventing, or destroying competition" in the case at bar.

The fourth case advanced by the Commission is Agreement for Consolidation or Merger Between American Mail Line Ltd., American President Lines Ltd., and Pacific Far East Line, Inc. (11 F.M.C. 53 (1967), rev'd on other grounds, Matson Navigation Co. v. FMC, 405 F.2d 796 (9th Cir. 1968)), involving an agreement for the merger or consolidation of three lines, with at least American Mail remaining a separate division for steamship operations; or, in the alternative, merging American President Lines and Pacific Far East into a single entity, with American Mail remaining a subsidiary. This case may be distinguished from the case at bar in that the former involved a merger or consolidation, not simply a sale in which both the buyer and seller retain their separate corporate existence and in which the seller is free at any time to compete with the buyer. While the Commission in the former case stated that "section 15 provides for continuing [FMC] supervision where it is called for —but we do not concede that the provision for continuing supervision of agreements requiring it limits our authority to only those agreements" (11 F.M.C., at 60–61), the transaction in that case, a merger or consolidation, is fundamentally distinct from that presented by the case at bar. The Commission's finding in *Matson* that it had jurisdiction under Section 15, then, is not determinative of the issue in the case here, even assuming that the FMC correctly determined its jurisdiction in *Matson*. See *infra*, our discussion of the Ninth Circuit's decision.

Agreement 9905 Between Moore-McCormack Lines, Inc., and American Export Isbrandtsen Lines, Inc. (11 Pike & Fischer Ship Reg.Rep. 1090 (1970)), another case cited by the Commission, involves a contract of sale of four containerships, constructed with the aid of construction-differential subsidy, by Moore-McCormack to American Export. The parties submitted the agreement for United States Maritime Administration/Maritime Subsidy Board approval, not FMC approval under Section 15 (although the agreement does not itself preclude such review; it simply does not seek it). Approval by the former agencies was sought in view of the parties' intention to award an operating-differential subsidy to a wholly-owned subsidiary to be created by American Export.

The final case cited by the Commission is Agreement No. 9810—Stock Purchase Agreement Between Prudential Lines, Inc., and W. R. Grace & Co., and Transfer of Prudential Assets and Obligations to Grace Line, Inc. (13 F.M.C. 156 (1969)), providing for the purchase by Prudential from W. R. Grace & Co. of all the outstanding capital stock of Grace Line, leaving the latter as the sole operating company. Despite the fact that Prudential and Grace Line served entirely different and unrelated trade routes prior to Commission approval of Agreement No. 9810, that case differs from the case at bar in that Prudential was eliminated altogether as an operating company *and* remained solely as a holding company, controlling all of Grace Line's outstanding capital stock. As such, in contrast to the situation presented by the case at bar, there is clearly no incentive for Prudential to re-enter its former or any other trade served by Grace Line in view of its control of the latter. Oceanic, however, might well decide to acquire vessels and related personnel and shoreside equipment again to re-enter the North American Pacific Coast-Australasian or any other trade. FMC jurisdiction here was not challenged by judicial review.

covenant not to compete.[40] The Commission's silence in this respect for over fifty years indicates that even in the view of the FMC, at least until the present, Section 15 does not provide for FMC jurisdiction over a sale of ships, absent either a provision limiting competition among the parties or a provision of some other type requiring continuing supervision.

The type of agreements which the FMC has approved is indicated by the following:

> Any agreement on which the Commission stamps it [sic] approbation is specifically exempted from the antitrust laws under the act. . . . As of the time of the subcommittee's hearings [1962], there were in effect and approved by the Board [now the Commission] under section 15 roughly 129 conference agreements of one sort or another and some 400 related agreements dealing with transshipment of cargo, providing for joint service and joint sailing relationships, the pooling of cargo, etc. There had also been approved by the Board approximately 15 interconference agreements (not including agreements providing merely for joint administration of two or more conferences); 29 terminal agreements; 100 agreements between freight forwarders; and a relatively small number of miscellaneous agreements.[41]

These are the type agreements which fall within the seven categories of Section 15 and which we would expect to find as the grist for the FMC mill.

We recognize that there is a certain apparent inconsistency (more apparent than real) in holding that the parties are not required to file with the Commission and the Commission is not required to approve or disapprove a simple contract for the sale of ships and all assets, and yet a similar contract coupled with an agreement not to compete, which may involve more complicated antitrust issues than the more simple sale contract, is required to be filed and the Commission may have jurisdiction to pass on all questions, including antitrust issues. The explanation lies in (1) the wording of Section 15, (2) its legislative history, (3) the fact that the degree of antitrust complexity is not what determines the Commission's jurisdiction, and (4) perhaps in a caveat.

As for (1), the wording of Section 15, a simple sale of ships and assets, nothing more, is just not covered by any of the seven categories of "agreements" listed in Section 15. As for (2), the legislative history, the Alexander Report and all the background of the Shipping Act of 1916 show that a simple ship sale, even of all ships and assets, was not the type contract which was to be filed with and regulated by the Commission. The Alexander Report and the Congress prescribed two remedies for what ailed the shipping industry: compel the public filing of all noncompetitive agreements; and let a government agency approve or disapprove initially, then observe and supervise the continuing effect of the agreements. A ship sale is necessarily recorded to pass title

---

40. Another FMC case, not cited by the Commission here, Agreement No. 9827 Between United States Lines, Inc., and Sea-Land Service, Inc. (and Walter Kidde & Co., Inc., and R. J. Reynolds Tobacco Co., Guarantors) (11 Pike & Fischer Ship Reg.Rep. 759 (1970)), involved an agreement which initially provided for a twenty-year lease by one common carrier by water of sixteen containerships and related equipment of another with an option to purchase at the end of the lease period. It was subsequently modified to provide for the merger of the two carriers, and was submitted to the FMC for ap-

proval under Section 15. The Antitrust Division of the Department of Justice filed a complaint in the United States District Court for the District of New Jersey seeking to enjoin implementation of the merger agreement. The FMC sought to intervene and have the proceedings stayed and the complaint dismissed. The court ruled against the Commission, holding that the FMC does not have authority under Section 15 in regard to mergers in the shipping industry (United States v. R. J. Reynolds Tobacco Co., *supra*, note 19).

41. See note 36, *supra*, at 331.

and thus comes to public notice without being filed with the Commission; once the sale is made, there is a completely executed contract, over which there is no purpose in requiring Commission supervision. Thus it is not (3), the complexity of the antitrust issues involved, which determines if the FMC has jurisdiction. The FMC has or does not have jurisdiction depending on its statutory grant, and this was largely done by Congress on the basis of its recognition of industry needs and the helpfulness of government regulation. We have construed the FMC jurisdiction in relation to the antitrust laws, and done so above on the well-established principle that the normal administration of the antitrust laws should apply unless the statutory grant in derogation thereof is clear. Now for (4), the caveat: of the Commission's own decisions exercising authority to pass on antitrust questions after the "agreements" had been filed with the FMC, only two have ever been challenged in court.[42] And in these two instances, the courts reached opposite conclusions. To be accurate, then, administrative practice with respect to ship sales plus other continuing elements offers no support one way or the other.

## B. *Court Decisions.*

There are two principal cases cited by the parties, one supporting the Commission's interpretation of Section 15, the other the Department of Justice's view. The latter, United States v. R. J. Reynolds Tobacco Company,[43] involved the question of whether the FMC has authority to exempt shipping industry mergers from the antitrust laws. The court observed in regard to the legislative history accompanying Section 15:

> Consistently throughout the [Alexander] Report, mergers and other corporate reorganizations, when occasionally mentioned, are referred to by the terms "consolidation by ownership" and "control through acquisition" or variations thereof. Never is the word "agreement" used in the Report to refer to a merger agreement. It is clear that the Alexander Committee distinguished conceptually between agreements in the sense of ongoing, cooperative agreements and agreements of "consolidation" or "acquisition" (of which merger agreements are a form). . . .

> It must be assumed that the Alexander Committee knew that acquisitions of water lines and ownership of accessories to such lines were the products of contracts or agreements, as that term is commonly understood.

> . . .

> [The court], therefore, reach[es] the unavoidable conclusion that "agreement" is a term of art, a word of technical legal significance, as used by the Alexander Committee and Congress in enacting Section 15 of the Shipping Act.[44]

The court thus concluded that mergers and other forms of corporate reorganization were beyond the protection from

---

42. The first is Agreement for Consolidation or Merger Between American Mail Line Ltd., American President Lines Ltd., and Pacific Far East Line, Inc., *supra*, note 39. While finding in that case that the FMC does have jurisdiction under Section 15 to approve mergers, the Ninth Circuit vacated the Commission's order approving the merger on other grounds— that the Commission must await final action by the parties, not simply agreement on their part to agree to merge or consolidate, before considering the arrangement. As discussed *infra*, however we believe the Ninth Circuit's decision to be in error with respect to the reach of Section

15 over mergers, and agree basically with Judge Carter's dissent.

In the second, Agreement No. 9827 Between United States Lines, Inc., and Sea-Land Service, Inc. (and Walter Kidde & Co., Inc., and R. J. Reynolds Tobacco Co., Guarantors), *supra*, note 40, the court found the Commission without authority under Section 15 to approve shipping industry mergers, a conclusion with which we agree, *infra*.

43. 325 F.Supp. 656 (D.N.J.1971), see note 19, *supra*.

44. *Id.*, at 659.

the antitrust laws afforded by Section 15.

This contrasts with the two-to-one decision of the Ninth Circuit in Matson Navigation Co. v. FMC,[45] relied upon by the Commission here. Matson involved the issue of FMC authority to approve an agreement for the proposed merger or consolidation of three steamship lines. The court found that mergers were included within the meaning of the term "agreement" as employed in Section 15 of the Shipping Act. However, the *Matson* court did not engage in the careful analysis of the legislative history which characterizes Judge Garth's opinion in *Reynolds Tobacco, supra*. Instead, it simply contented itself with saying, after quoting from the Supreme Court's decision in Volkswagenwerk v. FMC:[46]

> While *Volkswagenwerk* did not deal with a merger agreement, its holding applies to such agreements with rational force. The direct and destructive impact upon competition which may result from a merger renders it the kind of arrangement as to which expert scrutiny most clearly is to be desired.

> [The court] conclude[s] that the Commission has jurisdiction under § 15 to approve merger agreements.[47]

We respectfully disagree with the majority in the Ninth Circuit, find Judge Carter's dissent persuasive, and submit that reliance on *Volkswagenwerk, supra,* by the Commission here and in *Matson* is misplaced.[48] Despite the Court's statement in *Volkswagenwerk* that "[n]othing in the legislative his-

tory suggests that Congress, in enacting § 15 of the Act, meant to do less than follow this recommendation of the Alexander Report [that all 'agreements' be filed for approval with the FMC] and subject to the scrutiny of a specialized government agency the myriad of restrictive agreements in the maritime industry,"[49] the reference to a "myriad of restrictive agreements" does *not* include agreements other than those of a continuing nature. The "myriad" includes such diverse agreements as pooling of earnings, losses, or traffic; fixing or regulating rates; allotting ports; and the like. Furthermore, the agreement at issue in *Volkswagenwerk* itself was a cooperative working arrangement of a continuing nature, entered into by an association of shipping industry employers subject to the Shipping Act, for the purpose of allocating among themselves a common assessment for a union trust fund.

The legislative history discussed above, illuminated by Judge Garth's analysis in *Reynolds Tobacco, supra,* makes clear that "agreements" as used by the Alexander Committee embraced the type involved in *Volkswagenwerk*, but did not include "mergers," "acquisitions," and the like, such as the sale of all assets in the case at bar.

## V. The Statute Applied to the Case at Bar

We reach a different result here from that of the *Matson* court majority, one additional reason being the different consequences we envisage following from our interpretation of the statute.

**45.** 405 F.2d 796 (9th Cir. 1968), see note 39, *supra.*

**46.** 390 U.S. 261, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968).

**47.** See note 45, *supra*, 405 F.2d at 800.

**48.** As Judge Carter observed, dissenting in part and concurring in part:
> Volkswagenwerk v. FMC, . . . as the majority correctly points out, did not deal with a merger. The case dealt

with a "cooperative working agreement," one of a "myriad of restrictive agreements in the maritime industry" . . . and one clearly within the scope of the Alexander Report. The case cannot be read to go the whole route and authorize FMC to approve mergers of great shipping corporations.
> *Id.*, at 803.

**49.** See note 46, *supra*, 390 U.S. at 276, 88 S.Ct. at 937.

The Ninth Circuit decision was partly based on a fear that:

. . . [T]o leave enforcement of antitrust policy in [merger and acquisition] cases to the FTC, the Department of Justice and the courts would apply the full and unconditional force of the antitrust laws to such agreements contrary to the intent of the Shipping Act that industry considerations must be taken into balance in judging industry arrangements.[50]

We take a different view. If the Department of Justice or the Federal Trade Commission attacks a shipping industry merger or acquisition in the courts as contrary to the antitrust laws, the Maritime Commission should be free to intervene on behalf of the "industry viewpoint." The inadequacy of vesting the Maritime Commission with jurisdiction to weigh industry and antitrust considerations in merger or acquisition situations is evident from the case at bar, in which:

(1) No hearing was held, even though Section 15 itself recognizes that a hearing is appropriate in all cases other than those "of a purely routine nature," which "have an impact on commerce that the Commission finds is de minimis," [51] and those of "a restrictive nature" where the "applicant for approval . . . [satisfies] the burden of demonstrating the need for anticompetitive restraints.

. . . " [52] The sale of all Oceanic's assets to Pacific Far East, however, can hardly be said without a hearing to have a de minimis impact on competition.

On the other hand, with no hearing, it was hardly possible for the applicants to meet satisfactorily all the objections to "anticompetitive restraints" Seatrain might have raised.

(2) No record was developed by the Commission, detailing its weighing of the antitrust and industry considerations.

(3) There is no possible way this court could review the FMC's consideration here of, inter alia, the antitrust implications of Oceanic's sale of all its assets to Pacific Far East. The weighing of the importance of governmental action contrary to antitrust policy and the opportunity for judicial review were two of the "relevant criteria" we enumerated in Hecht v. Pro-Football, Inc., supra, for determining "to what extent Congress has knowingly adopted a policy contrary to or inconsistent with the previously established antitrust laws . . . . " [53]

In contrast, full opportunity for a hearing, with participation of all interested parties, creation of a record, and full appellate court review, would be possible in an original action on this proposed sale in the U. S. District Court. Again, we intend no implication on the merits of any antitrust question which may be here involved, nor do we suggest that it is incumbent on any antitrust enforcement agency to challenge this sale contract. We do hold that it is not the Federal Maritime Commission which has the duty to approve or disapprove the type contract made the subject of this litigation.

---

50. See note 45, supra, 405 F.2d at 800.

51. See Marine Space Enclosures v. FMC, 137 U.S.App.D.C. 9, 16, 420 F.2d 577, 584, (1969), citing Volkswagenwerk v. FMC, supra, note 46, 390 U.S. at 276, 88 S.Ct. at 938, where the Court stated:

This is not to say that the Commission is without power to determine, after appropriate administrative proceedings, that some types or classes of agreements coming within the literal provisions of § 15 are of such a de minimis or routine character as not to require formal filing.

See also 46 U.S.C. § 833a (as added 6 Nov. 1966, Pub.L. 89–778, 80 Stat. 1358).

52. See id., 137 U.S.App.D.C. at 15, 420 F.2d at 583, citing FMC v. Aktiebolaget Svenska Amerika Linien, 390 U.S. 238, 244, 88 S.Ct. 1005, 19 L.Ed.2d 1071 (1968), where the Court observed that "[b]y its very nature an illegal restraint of trade is in some ways 'contrary to the public interest.' "

53. See text at footnote 11, supra.

In view of our finding that the Federal Maritime Commission lacks jurisdiction under Section 15 of the Shipping Act of 1916 to approve arrangements of the type involved here, which do not require the continued existence or participation of the parties in such arrangements, it is unnecessary for us to consider the other issues presented by this appeal. The decisions of the Commission approving Agreement No. 9903 and denying a petition to reopen are accordingly vacated, with the Commission directed to remove this agreement from its docket.

So ordered.