**LATIN AMERICA/PACIFIC COAST STEAMSHIP CONFERENCE and its member lines, Petitioners,**

v.

**FEDERAL MARITIME COMMISSION and United States of America, Respondents.**

No. 71–1107.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 21, 1972.

Decided May 10, 1972.

Certiorari Denied Oct. 24, 1972. See 93 S.Ct. 269.

Comm., and Irwin A. Seibel, Atty., Dept. of Justice, were on the brief for respondents.

Before TAMM and WILKEY, Circuit Judges, and MATTHEWS,* U. S. Senior District Judge for the District of Columbia.

TAMM, Circuit Judge:

After nearly a decade of litigation we are called upon to examine the ramifications of the Supreme Court's decision in Federal Maritime Comm. v. Aktiebolaget Svenska Amerika Linien, 390 U.S. 238, 88 S.Ct. 1005, 19 L.Ed.2d 1071 (1968), and decide whether the Federal Maritime Commission's instant order is in accordance with relevant law and supported by substantial evidence. Answering these questions in the affirmative, we affirm the order under review.

This is a petition for review of an order of the Commission amending a dual rate contract system to permit ocean shippers and receivers to separately contract for the carriage of goods under preferential rates in each of five trade areas served by petitioner, the Latin America/Pacific Coast Steamship Conference. Petitioners' existing exclusive patronage dual rate contract requires shippers, in order to obtain lower rates, to give their exclusive patronage to petitioners in all three outbound trades served by petitioners, and similarly requires receivers, in order to obtain lower rates, to do likewise with reference to petitioners' two inbound trades.

I. *History of Proceedings*

Mr. F. Conger Fawcett, San Francisco, Cal., with whom Mr. John P. Meade, Washington, D. C., was on the brief, for petitioners.

Mr. John R. Ewers, Atty., Federal Maritime Comm., for respondents. Messrs. James L. Pimper, Gen. Counsel, Federal Maritime Comm., Edward G. Gruis, Deputy Gen. Counsel, Paul J. Fitzpatrick, Atty., Federal Maritime

A. *Phase One*

The long procedural tangle in the instant case had its beginning in January of 1962 when petitioner, pursuant to section 15 of the Shipping Act [1] (hereinafter the "Act"), filed for approval of Agreement No. 8660 which created the Latin America/Pacific Coast Steamship Conference, superseding ten previously independent conferences serving inbound

---

* Sitting by designation pursuant to 28 U.S.C. § 294(c) (1970).

1. 46 U.S.C. § 814 (1970), reprinted in Appendix.

and outbound trade between the Pacific Coast of the United States and Latin America. Dividing the trade into five areas, the agreement provided that, although all members of the conference had a vote with reference to general matters, only those carriers actively serving a particular trade area could participate in the establishment of rates and related matters affecting that area. While the Commission was considering Agreement No. 8660, petitioners filed proposed dual rate contracts [2] for Commission approval under section 14b of the Act.[3] Under these contracts, shippers of goods in any of the outbound trade areas were committed to exclusive use of conference vessels in all three outbound trade areas, while receivers were obligated to exclusive use of conference vessels in both inbound trade areas.

After consideration of the record, the Commission rendered its decision in The Dual Rate Cases, 8 F.M.C. 16 (1964), which approved petitioners' Agreement No. 8660 and the dual rate contracts *subject* to the condition that petitioners offer their dual rate contracts to merchants on a *separate* basis in *each* of the five trade areas. The Commission expressed its concern stating that

> if the conference is permitted to offer a single dual rate contract which includes all five of the trade areas, merchants will be forced to obligate themselves to exclusive conference patronage in trade areas not desired in order to obtain contract rates in a trade area

where they feel the dual rate contract meets their needs. This seems to us neither necessary nor fair.

*Id.* at 50.

Petitioners and two other conferences filed petitions for review of the Commission's decision in the Ninth Circuit, which, although remanding for certain procedural infirmities, affirmed the Commission with respect to its section 14b actions. Pacific Coast European Conference v. United States, 350 F.2d 197 (9th Cir.), cert. denied, 382 U.S. 958, 86 S.Ct. 433, 15 L.Ed.2d 362 (1965). On petition for rehearing, however, the Ninth Circuit, in an unpublished *per curiam* opinion, set aside the five-contract separability condition imposed by the Commission.

### B. *Phase Two*

Following remand, the Commission instituted a rule making proceeding to determine whether the "one trade-one contract" requirement should be reimposed.[4] As a result of petitioners' challenge to the rule making format, a full evidentiary hearing was held, at the conclusion of which, the examiner, in an initial decision, upheld petitioners' dual rate contracts under section 14b. However, upon exception, the Commission once again imposed the condition that the conference offer its dual rate contract in *each* of the five trade areas,[5] relying upon the failure of petitioner to meet the "public interest" standard promulgated by the Commission in Investiga-

---

2. Senator Kefauver offered the following definition in the Senate debates:

 What is a dual-rate contract? Essentially, it is an exclusive patronage contract whereby a shipper—or consignee—promises to transport all of the cargo under his control, between ports within the scope of a steamship conference agreement, aboard vessels belonging to that conference. Shippers who do not sign such an agreement are assessed a rate, called the noncontract rate, substantially above the so-called contract rate which is available to signatories. In its most elemental terms, the dual-rate contract is nothing but an exclusive dealing arrangement in which

 signatory shippers are given preferential treatment while those unwilling to be bound are penalized by higher rates. Index to Legislative History of Steamship Conference Dual Rate Law, S.Doc. No. 100, 87th Cong., 1st Sess. 292 (1962).

3. 46 U.S.C. § 813a (1970), reprinted in Appendix.

4. Earlier, on February 16, 1966, the Commission approved the dual rate contract currently in use by petitioners. *See* Agreement No. 8660–Latin America/Pacific Coast Steamship Conference and Proposed Contract Rate System, 12 F.M.C. 149, 151 n. 3 (1969).

5. *Id.*

tion of Passenger Travel Agents, 10 F. M.C. 27 (1966), and affirmed by the Supreme Court in Federal Maritime Comm. v. Aktiebolaget Svenska Amerika Linien, *supra*, 390 U.S. at 243, 88 S.Ct. at 1009 wherein the Court upheld the Commission's test that

> conference restraints which interfere with the policies of antitrust laws will be approved only if the conferences can "bring forth such facts as would demonstrate that the [restraint] was required by a serious transportation need, necessary to secure important public benefits or in furtherance of a valid regulatory purpose of the Shipping Act."

C. *Phase Three*

The Conference, again protesting the decision moved the Commission to reopen the proceeding to afford it an opportunity to meet the new burden of proof imposed by *Svenska*. The Commission, acquiescing in a reopening, nevertheless, reaffirmed its previous "one trade-one contract" decision rejecting the examiner's initial decision once again. The Commission, noting that "the exclusive patronage tying arrangement embodied in a dual rate contract would clearly run counter to the antitrust laws," (J.A. 177–'78) concluded, that, under *Svenska*, this fact standing alone rendered petitioners' dual rate contracts "contrary to the public interest," and shifted the burden to petitioners of introducing "other evidence in the record [which] fairly detracts from the weight of this factor [antitrust conflict]" by demonstrating "the necessity for this restraint in terms of legitimate commercial objectives." Federal Maritime Comm. v. Aktiebolaget Svenska Amerika Linien, *supra*, 390 U.S. at 244, 246, 88 S.Ct. at 1009. Examining petitioners'

evidence, the Commission "remain[ed] unconvinced . . . that the present so-called single-contract system is required by some serious transportation need, necessary to secure important public benefits or in furtherance of any valid regulatory purpose of the Shipping Act." (J.A. 178). The Commission concluded that much of petitioners' evidence confused advantages attributable to the conference format with those resulting from the dual rate contracts and accordingly ruled against petitioners.

Before turning to the specific arguments advanced and issues raised on appeal, it will, in our view, facilitate matters to briefly examine the nature of the antitrust-regulatory conflict and cursorily survey the vagaries of the ocean shipping industry.

II. *Accommodation of Regulatory and Antitrust Policies*

Forced to steer a course between a regulatory Scylla and an antitrust Charybdis, we pause for a moment to reflect upon the rhyme and reason of our voyage.

Although the policies underlying the antitrust laws [6] and the regulatory agency statutes are conflicting,[7] their purposes—service to the public—are complementary. As we indicated in Northern Natural Gas Co. v. Federal Power Comm., 130 U.S.App.D.C. 220, 226, 399 F.2d 953, 959 (1968), they both attempt to "achieve the most efficient allocation of resources possible" and to "establish an atmosphere which will stimulate innovations for better service at a lower cost." *See also* Symposium on 'Regulated' Industries and Antitrust, 32 A.B.A. Antitrust L.J. 239–41 (1966).

It is all too clear that "[t]he general objective of the antitrust laws is promotion of competition in open mar-

6. The basic antitrust legislation is found in the Sherman Antitrust Act, 15 U.S.C. §§ 1–7 (1970) ; the Clayton Act, 15 U.S.C. §§ 12–27 (1970) ; and the Federal Trade Commission Act, 15 U.S.C. §§ 41–58 (1970). *See generally* House Select Comm. on Small Business, 89th Cong. 2d

Sess., Congress and the Monopoly Problem : History of Congressional Action in the Antitrust Field 1890–1966 (Comm. Print 1966).

7. *See* C. Fulda, Competition in the Regulated Industries : Transportation 1–5 (1961).

kets." [8] As Justice Black has eloquently observed, "[the antitrust laws were] designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. [They rest] on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions." Northern Pacific Railway Co. v. United States, 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958). The Supreme Court has "long recognized that the antitrust laws represent a fundamental national economic policy . . .," Carnation Co. v. Pacific West-bound Conference, 383 U.S. 213, 218, 86 S.Ct. 781, 784, 15 L.Ed.2d 709 (1966), and often commented upon the "indispensable role of antitrust policy in the maintenance of a free economy." United States v. Philadelphia National Bank, 374 U.S. 321, 348, 83 S.Ct. 1715, 1733, 10 L.Ed.2d 915 (1963). See Marine Space Enclosures, Inc. v. Federal Maritime Comm., 137 U.S.App.D.C. 9, 420 F.2d 577 (1969); Pacific Seafarers, Inc. v. Pacific Far East Line Inc., 131 U.S.App.D.C. 226, 237, 404 F.2d 804, 815 (1969). Indeed, they have been deemed important enough to be denominated the "Magna Charta of free enterprise." United States v. Topco Associates, Inc., 405 U.S. 596, 610, 92 S.Ct. 1126, 1135, 31 L.Ed.2d 515 (1972).

There are, on the other hand, particular economic or social objectives sought by Congress which are unattainable through the free forces of competition. In seeking these goals Congress has therefore established regulatory agencies to supervise certain industries. "Regulation of a specific industry . . .

'evidences congressional recognition that competition can assure protection of the public interest only in an industrial setting which is conducive to a free market and can have no place in industries which are monopolies because of public grant, the exigencies of nature, or legislative preference for a particular way of doing business.'" S. S. W., Inc. v. Air Transport Ass'n of America, 89 U.S.App.D.C. 273, 276, 191 F.2d 658, 661 (1951). "Of course, the fact that there is substantial regulation does not preclude the regulatory agency from drawing on competition for complementary or auxiliary support. Satisfactory accommodation of the peculiarities of individual industries to the demands of the public interest necessarily requires in each case a blend of private forces and public intervention." Federal Communications Comm. v. RCA Communications, Inc., 346 U.S. 86, 93–94, 73 S.Ct. 998, 1003, 97 L.Ed. 1470 (1953).

In those areas in which Congress has felt that competition is less appropriate, it has exempted the industries from the operation of the antitrust laws. See C. Kaysen & D. Turner, Antitrust Policy 41–43 (1959). The reasons generally advanced for these exemptions are: 1) disparity of economic power; 2) assistance for American businessmen against foreign competition; 3) incentives for research and development; 4) national defense needs; 5) maintenance of favorable federal-state relations; 6) the inherent nature of the activity; and 7) tradition.[9]

Various tests have been proposed for determining when antitrust exemptions should be granted. The better school of thought is that no exemptions should be permitted unless necessary to carry out the purpose of the statute. Thill Securities Corp. v. New York Stock Exchange, 433 F.2d 264, 268 (7th Cir.

8. Report of the Attorney General's National Committee to Study the Antitrust Laws 1 (1955). See generally C. Kaysen & D. Turner, Antitrust Policy 11–22 (1959); Bork, Bowman, Blake & Jones, The Goals of Antitrust: A Dialogue on Policy, 65 Colum.L.J. 363 (1965).

9. Pogue, The Rationale of Exemptions from Antitrust, 19 A.B.A. Antitrust Section 313 (1961).

547

1970), cert. denied, 401 U.S. 994, 91 S. Ct. 1232, 28 L.Ed.2d 532 (1971) *quoting* Silver v. New York Stock Exchange, 373 U.S. 341, 357, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). *See also,* Comment, Accommodations of Antitrust Law and Ocean Shipping Regulation, 4 Texas Int'l L. Forum 393, 409–12 (1968). An opposing school of thought is that once a regulatory agency has intervened in an industry, the antitrust laws should not apply unless the agency cannot effectively regulate the industry. Hale & Hale, *Competition or Control VI:* Application of Antitrust Laws to Regulated Industries, 111 U.Pa.L.Rev. 46, 58–59 (1962).

Some of the antitrust exemptions have been explicitly set forth in regulatory statutes. *E. g.,* Shipping Act, 46 U.S.C. § 814; Federal Communications Act, 47 U.S.C. §§ 221(a), 222(c) (1); Federal Aviation Act, 49 U.S.C. § 1384; Interstate Commerce Act, 49 U.S.C. §§ 5(11), 5b, 9; Webb-Pomerene Act, 15 U.S.C. § 62. These exemptions must in any event be narrowly construed. Maryland & Virginia Milk Producers Association, Inc. v. United States, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960); United States v. McKesson & Robbins, Inc., 351 U.S. 305, 316, 76 S.Ct. 937, 100 L.Ed. 1209 (1956).

Where the exemptions are not express, they must of course be inferentially gleaned, if at all, from the statute. However, we cannot overemphasize that "immunity from antitrust laws 'is not lightly implied.'" United States v. First City National Bank of Houston, 386 U. S. 361, 368, 87 S.Ct. 1088, 1093, 18 L.Ed. 2d 151 (1967) *quoting* California v. Federal Power Comm., 369 U.S. 482, 485, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962). *See* Georgia v. Pennsylvania R. R. Co., 324 U.S. 439, 456, 65 S.Ct. 716, 89 L.Ed. 1051 (1945). This cardinal rule of construction disfavoring lacunae in the application of antitrust laws has been applied to a myriad of industries faithfully catalogued in the following cases. Northern Natural Gas Co. v. Federal Power Comm., *supra,* 130 U.S.App.D.C. at 226–

227, 399 F.2d at 959–960; Alabama Power Co. v. Alabama Electric Cooperative, Inc., 394 F.2d 672, 682–683 (5th Cir. 1968) (Godbold, J., dissenting). Indeed, there is a presumption that antitrust principles apply unless a contrary intent appears expressly or by necessary implication. Cities of Statesville v. Atomic Energy Comm., 142 U.S.App.D.C. 272, 297, 441 F.2d 962, 987 (1969) (en banc) (Leventhal, J., concurring). *See also* Sabre Shipping Corp. v. American President Lines, Ltd., 285 F.Supp. 949, 953 (S.D.N.Y.1968), cert. denied sub nom., Japan Line Ltd. v. Sabre Shipping Corp., 395 U.S. 922, 89 S.Ct. 1774, 23 L.Ed.2d 239 (1969). As the Supreme Court has emphasized, "[r]epeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, and have only been found in cases of plain repugnancy between the antitrust and regulatory provisions." United States v. Philadelphia National Bank, *supra,* 374 U.S. at 350–351, 83 S.Ct. at 1734 (footnotes omitted) and authorities cited therein. *See* S. S. W., Inc. v. Air Transport Ass'n. of America, *supra,* 89 U.S.App.D.C. at 276, 191 F.2d at 661 (1951). Even where the agency's particular statutory standard requires that it override antitrust principles, this "does not compel unawareness of antitrust policies, and the agency may well be able to harmonize diverse and even competing policies." Cities of Statesville v. Atomic Energy Comm., *supra,* 142 U.S.App.D. C. at 297, 441 F.2d at 987 (Leventhal, J., concurring). *See* McLean Trucking Co. v. United States, 321 U.S. 67, 79, 64 S.Ct. 370, 88 L.Ed. 544 (1944). In essence then, the duty of the agencies and courts is to accommodate or harmonize antitrust and regulatory principles. *See* Seaboard Airlines R. R. v. United States, 382 U.S. 154, 156, 86 S.Ct. 277, 15 L.Ed. 2d 223 (1965) *quoting* Minneapolis & St. L. Ry. v. United States, 361 U.S. 173, 80 S.Ct. 229, 4 L.Ed.2d 223 (1959). Indeed, regulatory agencies have long used the antitrust laws to give "understandable content to the broad statutory concept of 'the public interest'" often found

in their statutory charters. Federal Maritime Comm. v. Aktiebolaget Svenska Amerika Linien, *supra,* 390 U.S. at 244, 88 S.Ct. 1005. *See* Volkswagenwerk Aktiengesellschaft v. Federal Maritime Comm., 390 U.S. 261, 274 n. 20, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968); Denver & Rio Grande Western R. R. Co. v. United States, 387 U.S. 485, 492–494, 87 S.Ct. 1754, 18 L.Ed.2d 905 (1967); California v. Federal Power Comm., *supra,* 369 U. S. at 484–485, 82 S.Ct. 901; United States v. Radio Corporation of America, 358 U.S. 334, 351, 79 S.Ct. 457, 3 L.Ed. 2d 354 (1959); McLean Trucking Co. v. United States, *supra,* 321 U.S. at 79–80, 64 S.Ct. 370; and City of Pittsburgh v. Federal Power Comm., 99 U.S.App.D.C. 113, 237 F.2d 741 (1956).

With this background we now proceed to an examination of the ocean shipping industry in light of the relevant criteria including "the specific language of the congressional statute involved, any legislative history which would throw light on the congressional intent, the relative importance of the governmental action which is asserted to override antitrust policy, whether the governmental agency is required to take into consideration the possible anticompetitive effect of its actions, whether the agency is required to adhere to a clearly defined and restricted statutory directive, and to what extent the agency's actions are subject to judicial review." Hecht v. Pro-Football Inc., 144 U.S.App.D.C. 56, 60, 444 F.2d 931, 935 (1971).

III. *The Ocean Shipping Industry— Statutory Framework and Svenska*

A. *The Shipping Act of 1916—Rationale and Content*

Shipping conferences, organizations of steamship lines whose members regularly transport cargo, were organized to limit the competition which would otherwise exist between its members and to insulate member carriers from non-member carrier competition. Conferences were found necessary to combat the cutthroat competition and resulting business failures among shipping lines which often depressed the rates charged by the carriers to the cost of the voyage itself.[10] Once established, the conference members agreed among themselves upon matters such as rates, market quotas and sailing dates.

The six economic factors most frequently cited to justify the existence of the conference system are: 1) ease of market entry; 2) the industry's rigid fixed and operating cost structure; 3) the absence of any governmental control over the level of ocean freight rates; 4) the difference in operating costs of similar vessels flying different flags; 5) the almost invariable imbalance between inbound and outbound cargo; and 6) overtonnaging.[11]

In the early part of the twentieth century these conferences came under close scrutiny by the British Royal Commission on Shipping Rings which published a report in 1909. After extended study the Commission concluded that conferences should be permitted to continue since they encouraged regular dependable service at relatively stable rates. Several years after the report of the Royal Commission the House Committee on the Merchant Marine and Fisheries, of which Representative J. W. Alexander was chairman, undertook an exhaustive inquiry into the practices of shipping conferences. The Committee's findings, contained in what has become known as the Alexander Report,[12] resulted in the conclusion that while certain conference practices needed correcting, the confer-

---

10. D. Marx, International Shipping Cartels 19–22 (1953).

11. S.Rep.No.860, 87th Cong., 1st Sess. 5–6 (1961); U.S.Code Cong. & Admin. News, p. 3108.

12. The work of the Committee is set forth in three volumes of hearings and diplomat-ic and consular reports. Proceedings of the House Comm. on the Merchant Marine and Fisheries in the Investigation of Shipping Combinations under House Resolution 587, 62nd & 63d Cong. (1913–14). The Committee's recommendations are contained in a fourth volume. House Comm. on Merchant Marine and Fish-

ence system as a whole was a worthwhile device.[13] Among the advantages listed were those such as "greater regularity and frequency of service, stability and uniformity of rates, economy in the cost of service, better distribution of sailings, maintenance of American and European rates to foreign markets on a parity, and equal treatment of shippers through the elimination of secret arrangements and underhanded methods of discrimination."[14] The Report concluded that these advantages could only be preserved "by permitting the several lines in any given trade to cooperate through some form of rate and pooling arrangement under Government supervision and control."[15]

The basic recommendations of the Alexander Report were enacted into law by Congress in the Shipping Act of 1916.[16] Section 15 of the Act required certain conference agreements to be filed with an appropriate governmental body for approval.[17] Approved agreements were exempted from the antitrust laws. Other sections of the act prohibited certain prevalent anticompetitive[18] and discriminatory practices.[19] The Act did not, however, speak to another anticompetitive device—dual rates—subsequently adopted by many conferences.[20]

The dual rate system was successfully employed by conferences until the Supreme Court's decision in Federal Maritime Board v. Isbrandtsen Co., 356 U.S. 481, 78 S.Ct. 851, 2 L.Ed.2d 926 (1958), where the Court held that such agreements were illegal "where they [were] employed as predatory devices." *Id.* at 499, 78 S.Ct. at 862. The Court's decision, casting a pall over dual rate contracts, prompted the Congress to enact interim legislation to neutralize the Court's holding by preserving the legality of dual rate contracts in effect at the time of the *Isbrandtsen* decision.[21] Following an extensive three year investigation, the Congress enacted permanent legislation, the 1961 amendments to the Shipping Act.

B. *The 1961 Amendments to the Shipping Act*

Three subcommittees of Congress—the Antitrust Subcommittee of the House Judiciary Committee, the Subcommittee on Steamship Conferences of the House Merchant Marine and Fisheries Committee,

---

eries, Report on Steamship Agreements and Affiliations, H.R.Doc.No.805, 63rd Cong., 2d Sess. (1914).

13. The entire history of steamship agreements shows that in ocean commerce there is no happy medium between war and peace when several lines engage in the same trade. . . . To terminate existing agreements would necessarily bring about one of two results: the lines would either engage in rate wars which would mean the elimination of the weak and the survival of the strong, or, to avoid a costly struggle, they would consolidate through common ownership. Neither result can be prevented by legislation, and either would mean a monopoly fully as effective, and it is believed more so, than can exist by virtue of an agreement.
Alexander Report, *supra*, note 12, at 416.

14. *Id.*

15. *Id.*

16. Act of Sept. 7, 1916, Ch. 451, § 1, 39 Stat. 728, as amended, 46 U.S.C. §§ 801–842 (1970).

17. 39 Stat. 733, as amended, 46 U.S.C. § 814 (1970).

18. Section 14 prohibited carriers from boycotting a shipper for patronage of another carrier. It also forbade the use of "fighting ships"—ships assigned by the conference to underbid independent competitors with distribution of resulting losses among conference members—and deferred rebates, a rebate given to a shipper for a specified period of exclusive patronage. § 14, 39 Stat. 733, as amended, 46 U.S.C. § 812 (1970).

19. Section 16 outlawed undue prejudice against any person, locality or type of traffic. § 16, 39 Stat. 734, as amended, 46 U.S.C. § 815 (1970). Section 17 prohibited discriminatory rates against particular ports or American exporters. § 17, 39 Stat. 734, as amended, 46 U.S.C. § 816 (1970).

20. H.Rep.No.1419, 87th Cong., 2nd Sess. 185–87 (1962).

21. P.L. 85–626, 72 Stat. 574 (August 12, 1958), as amended, P.L. 86–542, 74 Stat. 253 (June 29, 1960), P.L. 87–75, 75 Stat. 195 (June 30, 1961).

and the Merchant Marine and Fisheries Subcommittee of the Senate Commerce Committee—conducted exhaustive investigations into the operations of shipping conferences in international trade. The House Merchant Marine and Fisheries Committee concluded that dual rate contracts were necessary to ensure strong conferences, which, although not flawless, did offer certainty of rates and scheduling redounding to the benefit of all.[22] The Antitrust Subcommittee of the House Committee on the Judiciary, naturally more antitrust oriented, placed greater emphasis upon the predatory anticompetitive devices of the conferences.[23] "The Bill which was finally passed in the House reflected the fundamental conflict in approach to the regulation of the industry pursued and adopted by the two committees." American Export Isbrandtsen Lines v. Federal Maritime Comm., 127 U.S.App.D.C. 62, 70, 380 F. 2d 609, 617 (1967).

The Senate hearings were primarily concerned with reconciling some of the contradictory provisions in the House bill. The bill as reported out by the Senate[24] was more antitrust exemption oriented than that which passed the House.[25] The bill as finally reported out by the House-Senate Conference and enacted into law adopted essentially the Senate approach.[26] As we have said it was "largely a triumph for the conference interests in that most of the antitrust aspects of the legislation were deleted and dual rate contracts were legalized."[27] American Export Isbrandtsen Lines v. Federal Maritime Comm., supra, 127 U.S.App.D.C. at 70, 380 F.2d at 617.

The 1961 amendments made for our purposes several relevant changes in the law. Section 15 was amended to pro-

22. H.Rep.No.498, 87th Cong., 1st Sess. (1961).

23. H.Rep.No.1419, supra, note 20.

24. S.Rep.No.860, supra, note 11.

25. See Note, Rate Regulation in Ocean Shipping, 78 Harv.L.Rev. 641 (1965).

26. Act of Oct. 3, 1961, P.L. 87–346, § 2, 75 Stat. 763, as amended, 46 U.S.C. § 814 (1970).

Basically, the difference between H.R. 6775 as it passed the House and passed the Senate is in the manner of approach in four major respects.

(1) The House bill declared exclusive patronage shipping contracts between carriers and shippers to be prohibited except upon prior approval by the appropriate Federal Government agency (now Federal Maritime Commission) and required that the use of such contracts by steamship conferences or individual steamship companies could be approved only if they met certain specified criteria and standards. The bill as it passed the Senate eliminated the prohibition language and affirmatively permitted the use of dual rate, or exclusive patronage, contracts.

(2) The bill as it passed the House made it mandatory that all criteria be affirmatively met before the use of exclusive patronage contracts would be permitted and conference agreements approved by the Commission. The Senate version would permit the use of exclusive patronage contracts unless the Commission made findings to the contrary.

(3) The bill as it passed the House contained several major provisions intended to protect the status of independent carriers who might choose not to join a conference but which would, at the same time, give the conferences full and fair opportunity to operate with effective dual-rate systems. The bill as it passed the Senate, for the most part eliminated all such provisions of an antitrust nature.

(4) The bill as it passed the House provided that conferences of carriers or individual carriers operating in the foreign commerce of the United States must designate persons upon whom service of process may be made within the United States and provide records or other information, wherever located, required by any order of the Commission. These features were stricken from the bill in the Senate version.

As agreed upon, by the conferees, the bill in major respects conforms with the Senate approach on the foregoing points. Index to Legislative History, supra, note 2, at 444.

27. See Antitrust Exemptions: Ocean Shipping Conferences, 33 A.B.A. Section of Antitrust Law 56, 61 (1967).

vide considerably broader Commission authority by permitting disapproval of any conference agreement found to be "contrary to the public interest."[28] Section 14b, the heart of the 1961 amendments, was added to provide that

> the . . . Commission . . . shall . . . permit [dual rate agreements] . . . unless the Commission finds that the contract . . . will be detrimental to the commerce of the United States or contrary to the public interest, or unjustly discriminatory or unfair as between shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors.[29]

In addition to the above requirements, Congress provided that in order to obtain Commission approval under § 14b, dual rate agreements must meet eight other specific requirements as well as a ninth requirement that the contract shall contain "such other provisions not inconsistent herewith as the Commission shall require or permit."

### C. Svenska

The 1961 amendments came before the Supreme Court for the first time in *Svenska*. In that case the Court upheld the Commission's requirement that conference restraints which interfere with the policies of the antitrust laws be approved only if the conference can bring forth such facts as would "demonstrate that the [restraint is] required by a serious transportation need, [or in order] to secure important public benefits." The Court concluded that the 1961 amendments did not confer absolute antitrust immunity on conferences and that the test formulated by the Commission was an appropriate refinement of the "public interest" standard added to § 15 by the 1961 amendments.

### IV. The Issues and their Resolution

On appeal petitioners advance several theories for setting aside the Commission's order. Distilled to the essence, these theories number two. First, petitioners urge that the Commission committed error in relying upon the rationale and standards of *Svenska* in that the principles were intended to apply only to § 15 of the Act, not § 14b. Furthermore, they urge that the unique factual circumstances in *Svenska* bar its application to the instant case. Petitioners' second contention is that even if we should find that the Commission's simulated *Svenska* test used in the case *sub judice* is proper, the Commission misapplied it and improperly evaluated the evidence in arriving at its conclusion.

### A. Commission Properly Found that the Rationale and Standards of Svenska Apply

The Commission relied upon *Svenska* in two ways. First, it used *Svenska* to find that under § 14b incompatibility with the antitrust laws is a sufficient reason for denying immunity from these laws. Second, it relied upon *Svenska* to justify placing the burden of proof upon petitioners. Although not without difficulty, we must conclude that these dual applications of *Svenska* are neither arbitrary nor capricious.

#### 1. Svenska: Antitrust Immunity

Petitioners' contention that the purpose of the statutory scheme would be defeated if incompatibility with the antitrust laws can be a sufficient reason for denying immunity from these laws is untenable. As the Court recognized in Federal Maritime Comm. v. Aktiebolaget Svenska Amerika Linien, *supra*, 390 U.S. at 242–243, 88 S.Ct. 1005, the Shipping Act of 1916 conferred only *limited* antitrust immunity upon the shipping industry. We have recently made mention of this very fact in Seatrain Lines, Inc. v. Federal Maritime Comm., 460 F.2d 932 at 940 (D.C. Cir. March 23, 1972) where we observed

> that Congress intended to tolerate only the *minimum* anticompetitive be-

28. § 2, 75 Stat. 763, 46 U.S.C. § 814 (1970).

29. § 1, 75 Stat. 762, 46 U.S.C. § 813a (1970).

havior necessary to preserve an essentially competitive structure in the maritime industry by striving to avoid either the failure or consolidation of independent steamship lines by the method of government supervision of anticompetitive working arrangements. While Congress recognized that in order to accomplish this result a measure of competition might have to be sacrificed, such as permitting agreement on rates or pooling of earnings, it did not intend thereby to remove *all* effective competition. (Emphasis supplied).

■ The 1961 amendments were not intended to do away with this limited immunity. As the Senate Report indicated:

The hearings of the committee have made it quite clear that our traditional antitrust concepts cannot be *fully* applied to this aspect of international commerce. Your committee has concluded that any attempt to effect regulation of this commerce in a measure *comparable* to that applied to our domestic commerce would be highly detrimental to our essential American-flag merchant marine. (Emphasis supplied).[30]

The House Report similarly commented that "[t]he committee believes that the present bill represents a *minimum* but necessary deviation from the concepts of the antitrust law." (Emphasis supplied).[31]

■ It is noteworthy that the 1961 amendments articulated a "public interest" standard couched in substantially similar language in both sections 15 and 14b.[32] The Court in *Svenska* indicated that the "public interest" standard embodied in section 15 included antitrust considerations. We see no reason to reach a different conclusion with regard

to section 14b in light of the legislative history and rules of construction cited above. We feel that the ambiguities, if any, should be resolved in favor of free competition. McLean Trucking Co. v. United States, *supra*, 321 U.S. at 94, 64 S.Ct. 370 (Douglas, J., dissenting).

### 2. *Svenska: Burden of Proof*

■ Petitioners assert that the mandatory language and legislative history of section 14b preclude imposing the burden of proof upon them. Admittedly, section 14b appears mandatory. The statute provides that the "Commission . . . *shall* . . . permit [dual rate contracts] . . . *unless* the Commission finds that the contract . . . will be detrimental to the commerce of the United States or contrary to the public interest, or unjustly discriminatory or unfair . . . ." (Emphasis supplied). However, the language of section 15 is no less mandatory. Section 15 provides that the "Commission *shall* . . disapprove . . . any agreement . . . it finds to be unjustly discriminatory or unfair . . . , or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest . . . , and *shall* approve all other agreements." (Emphasis supplied). Despite this mandatory language in section 15, the Supreme Court has permitted imposing the burden of proof upon conferences in section 15 proceedings. We see no reason to differ with respect to section 14b, despite petitioners assertions that the legislative history dictates an opposite result.

Petitioners also rely upon a change in the statutory language of § 14b. As introduced in the House, the bill required the Commission to make an affirmative finding that § 14b contracts would be in the public interest. However, as enacted, the positive finding requirement was

---

30. S.Rep.No.860, *supra*, note 11, at 2, 1961 U.S.Code Cong. & Admin.News, p. 3109.

31. H.Rep.No.498, *supra*, note 22, at 12.

32. The language of section 14b is: "detrimental to the commerce of the United States or contrary to the public interest."

Section 15 uses the following words: "detriment of the commerce of the United States, or to be contrary to the public interest."

deleted from § 14b.[33] Petitioners intimate that this evinces an intent to place the burden of proof upon the Commission. In rejecting such an analysis, we again refer to *Svenska* where the Court interpreted § 15, which similarly requires no affirmative showing by the Commission, as susceptible of placing the burden of proof upon petitioners.[34] Furthermore, the excision of the affirmative showing requirement may have been thought useful, as the Senate Report observes, in that it allows easy cases to be disposed of quickly without building an extensive record.[35]

Turning from the language of the statute to the legislative history of § 14b, we candidly admit that our statutory exegesis is not without difficulty, however, in light of the general rules of construction cited herein, we conclude that the Commission's approach to § 14b and *Svenska* is not arbitrary, unreasonable or capricious.

Petitioners, asserting that the legislative history of § 14b indicates that Congress did not intend to place the burden of proof upon the proponents of dual rate contracts, place particular reliance upon the following passage in the Senate Report:

> Your committee believes that if the [nine] specific requirements set forth in its amendments are met by the proposed contract, it should be entitled to Commission approval unless the Commission finds that the contract would be detrimental to the commerce of the United States, or contrary to the public interest or unjustly discriminatory or unfair. *We believe that any contract which contains the [nine] safeguards expressly required by the amended bill makes out a prima facie case that the contract is not detrimental to our commerce, or contrary to our public interest, or unjustly discriminatory or unfair.* (Emphasis supplied).[36]

33. *See* H.Rep.No.498, *supra*, note 22, at 18 where the Federal Maritime Board expressed its dissatisfaction with the positive finding requirement, particularly with respect to § 15.

> At page 4, lines 15 and 16, we recommend that the words "that it affirmatively finds to be in the public interest" be stricken. In conformity with other similar statutes, such as the Aviation Act of 1958, we believe that, if a public interest standard is to be applied by the Board, it should be phrased in terms of permitting the approval of agreements which the Board does not find to be adverse to the public interest. See 49 U.S.C. 1382(b). Requiring a positive finding in favor of the public interest would prevent carriers from operating under arrangements which, although not meriting disapproval under the standards of the statute, could not be shown to positively contribute to the public interest.

34. A similar argument was unsuccessfully pressed by Respondents in *Svenska*. *See* Supreme Court Brief for Respondents in *Svenska* at 61–62.

35. *See* S.Rep.No.860, *supra*, at 23, 1961 U.S.Code Cong. & Admin.News, p. 3130.

> 2. *In view of the [nine] specific safeguards which must be in dual-rate contracts before the Commission may approve them, must the Commission also be required to make findings, based on substantial evidence, that the contracts are not (1) detrimental to the commerce of the United States, or (2) contrary to the public interest, or (3) unjustly discriminatory or unfair as between shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors?* (Emphasis in original).

> In addition to [nine] specific safeguards which must be in each dual-rate contract, the bill as it passed the House would require the Commission to find that the contract was (1) not intended to or reasonably likely to cause the exclusion of any other carrier from the trade, (2) not detrimental to the commerce of the United States, and (3) not contrary to the public interest.

> Your committee concluded that in order for the Commission to make these additional findings, the parties applying for permission to use dual-rate contracts would have to build extensive records before the Commission, even though there might be no opposition to the contracts, and even though they might clearly contain the [nine] matters expressly required by statute.

36. S.Rep.No.860, *supra*, note 11, at 23, 1961 U.S.Code Cong. & Admin.News, p. 3130. *See also id.* at 33–34.

Even assuming this passage is as important as petitioners would have us believe, they have overlooked what the Ninth Circuit has denominated an "all-important proviso," [37] section 14b(9), which states the Commission shall approve contracts filed provided that the contract expressly "contains such other provisions not inconsistent herewith as the Commission shall require or permit." Assuming the passage in the Senate Report is as noteworthy as petitioners contend, we conclude, mindful of the maxims of construction herein cited, that the Commission was empowered to include consideration of antitrust principles under § 14b(9) thereby requiring petitioners to surmount antitrust hurdles prior to taking advantage of the "prima facie" language in the Senate Report. We do not find such an interpretation to be inconsistent with the Shipping Act.

■■ Although the legislative history of § 14b(9) is not free of doubt, we believe it supports an expansive reading. Enacted in substantially the same form as introduced,[38] § 14b(9) was intended to confer upon the Commission a "broad rulemaking mandate." [39] Despite opposition to § 14b(9) from the shipping industry on the ground that it would give the Commission too much discretion,[40] Congress enacted the clause. Its purpose was to provide flexibility in the hands of the Commission.[41] Indeed, it was referred to as a "catchall" [42] during the hearings.[43] Furthermore, the legislative history indicates that the Commission was empowered to "establish minimal standards, for dual rate contracts *beyond* those set forth in Public Law 87–346." (Emphasis supplied.) [44]

In our view the imposition of the *Svenska* burden does not pose an insurmountable obstacle for petitioners. As we have said, "parties alleging anticompetitive conditions in proceedings before other agencies are frequently afforded the benefit of generous presumptions and shifts in burden of proof once they have demonstrated the existence of non-frivolous antitrust questions." Hale v. Federal Communications Comm., 138 U.S.App.D.C. 125, 133, 425 F.2d 556, 564 (1970) (Tamm, J., concurring). Many scholars have also approved placing the burden of proof upon those seeking antitrust limitations.[45] As the Supreme Court indicated in *Svenska,* placing the burden of proof upon the conference does not make the limited antitrust immunity conferred by the Shipping Act illusory because actions which would violate antitrust laws may still be approved if sufficient justification for them exists. Furthermore, the Commission must, of course, adduce substantial evidence to support its finding of a statutory reason—*e. g.,* contrary to public in-

37. Pacific Coast European Conference v. United States, 350 F.2d 197, 203 (9th Cir.), cert. denied, 382 U.S. 958, 86 S.Ct. 433, 15 L.Ed.2d 362 (1965).

38. Index to Legislative History, *supra,* note 2, at 22.

39. *Id.* 350 F.2d at 213.

40. Hearings Before the Merchant Marine and Fisheries Subcomm. of the Senate Comm. on Commerce on H.R. 6775, 87th Cong., 1st Sess. 241, 520–21, 534 (1961).

41. Hearings Before the Special Subcomm. on Steamship Conferences of the House Comm. on Merchant Marine and Fisheries on H.R. 4299, 87th Cong., 1st Sess. 33 (1961).

42. "Catchall" has been used in similar contexts. *See* Federal Maritime Board v. Isbrandtsen Co., 356 U.S. 481, 492, 78 S.Ct. 851, 2 L.Ed.2d 926 (1958); Seatrain Lines, Inc. v. Federal Maritime Comm., 460 F.2d 932 at 935 n. 4 (D.C. Cir. 1972).

43. Hearings Before the Special Subcomm. on Steamship Conferences of the House Comm. on Merchant Marine and Fisheries on H.R. 4299, 87th Cong., 1st Sess. 491 (1961).

44. H.Rep.No.1419, *supra,* note 20, at 390.

45. *See, e. g.,* Baker, The Antitrust Division, Department of Justice: The Role of Competition in Regulated Industries, 11 B.C.Ind. & Com.L.Rev. 571, 591 (1970); Turner, The Scope of Antitrust and Other Economic Regulatory Policies, 82 Harv.L. Rev. 1207, 1238 (1969).

terest—for disapproving the contract, "but once an antitrust violation is established, this alone will normally constitute substantial evidence that the agreement is 'contrary to the public interest,' unless other evidence in the record fairly detracts from the weight of this factor." Federal Maritime Comm. v. Aktiebolaget Svenska Amerika Linien, *supra*, 390 U.S. 245–246, 88 S.Ct. 1010. It is to this end which we now turn our inquiry.

### B. Commission Properly Found that Petitioners Failed to Meet Their Burden of Proof

 Our function on appeal is to determine whether there is substantial evidence in the record to support the conclusions reached by the Commission. Consolo v. Federal Maritime Comm., 383 U.S. 607, 618–621, 86 S.Ct. 1018, 16 L. Ed.2d 131 (1966); Swayne & Hoyt Ltd. v. United States, 300 U.S. 297, 57 S.Ct. 478, 81 L.Ed. 659 (1937). In so doing we must recall that the Commission is entitled to draw reasonable inferences from the evidence. Federal Maritime Comm. v. Aktiebolaget Svenska Amerika Linien, *supra*, 390 U.S. at 248, 88 S.Ct. 1005. Pursuing our statutory duties we must defer, as we do in the primary jurisdiction doctrine,[46] to agency expertise where appropriate, American Export Isbrandtsen Lines v. Federal Maritime Comm., *supra*, 127 U.S.App.D.C. at 93, 380 F.2d at 620, however, we must be wary for "the deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia." Volkswagenwerk Aktiengesellschaft v. Federal Maritime Comm., *supra*, 390 U.S. at 272, 88 S.Ct. at 935 *quoting* American Ship Building Co.

v. National Labor Relations Board, 380 U.S. 300, 318, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965). Our scope of review has only recently been summarized by the Fifth Circuit in Port of New York Authority v. Federal Maritime Comm., 429 F.2d 663, 666 (5th Cir. 1971), cert. denied, 401 U.S. 909, 91 S.Ct. 867, 27 L.Ed.2d 806 (1971):

It is to be noted preliminarily that this review is in the frame of reference of a review involving the expertise of an administrative agency. . . . As to fact questions, we must consider whether the order in question is supported by substantial evidence. We are not to review the matter de novo nor are we to substitute our discretion for that of the Commission. Congress created the Commission to provide a forum for the solution of the technical and complex matters involved in the shipping industry.

At the outset, we note that this is not the first time we have upheld a Commission finding that a dual rate contract violated the Shipping Act where the contract obligated the shipper to more than one trade area. *See* U.S. Atlantic & Gulf Australia-New Zealand Conference v. Federal Maritime Comm., 124 U.S.App. D.C. 303, 364 F.2d 696 (1966).

In light of our conclusion that the burden of proof rests upon petitioners, not the Commission, we must consider whether petitioner did in fact meet this burden. Eleven witnesses, including conference officials, carrier representatives and freight forwarders, testified on petitioners' behalf. Basically, all the testimony[47] favored petitioners' dual rate contract proposal.[48] The justifica-

---

46. *See* Far East Conference v. United States, 342 U.S. 570, 574–575, 72 S.Ct. 492, 96 L.Ed. 576 (1952); United States Navigation Co. v. Cunard Steamship Co., 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408 (1932). *See generally* K. Davis, Administrative Law Treatise §§ 19.05–19.07 (1958).

47. Dow Chemical Co. which originally had objected to the dual rate contracts subsequently withdrew its objection. Agree-

ment No. 8660, Latin America Pacific Coast Steamship Conference & Proposed Contract Rate System, *supra*, note 4, 12 F.M.C. at 151 n. 3.

48. Petitioners urge that *Svenska* has no application to the instant case since in *Svenska*, unlike the case *sub judice*, there was opposition to the proposed contracts and allegations of harm. We find no such limitation express or implied in *Svenska*. Furthermore, the point is not so

tions advanced for the proposal included increased rate stability, better service and increased investment incentive. However, petitioners were unable to demonstrate either that these advantages were due to the two-contract system or that these advantages would cease upon enactment of a five-contract sys-tem. As the Commission indicated after a thorough review of the evidence, the witnesses often con-fused and were unable to distinguish ad-vantages derived from conference amal-gamation and the dual rate contract sys-tem.[49] Indeed, some witnesses assumed the choice was between petitioners' pro-

much who or how many are opposed to the contract, but rather what are the legitimate commercial objectives to be achieved by the proposal.

49. As the Commission indicated one could conclude from the testimony that the ad-vantages were due to establishment of the conference system just as easily as due to the petitioners' contract rate system. The Commission offered the following illus-trative testimony.

Q. Mr. Flook, you have been a party to, signatory to the dual rate contract since 1961?
A. Yes.
Q. And you indicate in your written testimony that it has been your ex-perience that the rate agreement cov-ering the three southbound and two northbound has resulted in improved service; is that correct? [sic]
A. Yes.
Q. On the part of the Conference?
A. Yes.
Q. What are you comparing that to?
A. Well, we are comparing that to the previous system where there were 10 individual rate agreements.
Q. So since the Federal Maritime Com-mission's approval of the super confer-ences, we might call it, you have gotten better service?
A. We have, yes.
Q. In your opinion, is this attributable to the amalgamation of separate con-ferences into one?
A. Yes, it is an ability by the Con-ference, I feel, to better structure rates.
Q. I don't understand that.
A. Well, with the Conference control-ling the five different trade areas, three southbound and two northbound, we feel that it offers the lines a greater oppor-tunity through the participation of the European lines that do service the area, to offer better service both north and southbound.
Q. When you say better service, can you be a little bit more specific there?
A. Well, as you perhaps know, there are several European lines which are carrying cargo from Europe to the Pa-cific Coast and they stop in on the way to Central America.

Q. And those European lines are mem-bers of the Conference?
A. Yes, and they bring cargo up to the United States, so we have the additional sailings which offer us more flexibility in bringing us cocoa beans at the time we need it, up to the United States.
Q. And prior to the approval of the super conference, the European lines were precluded from stopping into those Central American areas?
A. They were not precluded that I recall, but they did not offer it on a scheduled basis.
Q. More specifically, how has the im-position of the dual rate agreement in-creased the service to you? The dual rate agreement is completely apart from the approval of the Conference rate? [sic]
A. No, no. The dual rate agreement, in my opinion, offers to the line the op-portunity to be assured of sufficient patronage which would justify the scheduling of vessels at regular in-tervals, and the receivers benefit through this scheduling.
Q. Has service increased from the time when the dual rate agreement was ini-tially imposed on all areas?
A. It would be very difficult to answer that question because the service is dictated by the amount of cargo offer-ings. It may have decreased in the number of sailings both to the United States and from the United States on the Pacific Coast, but that might be due to the overall reduction in the volume of cargo moving and not attributable to the difference in the Conference struc-ture today on what it was previously. [sic]
Q. Has there, in fact, been a diminu-tion of service?
A. Not within the last two or three years I would say. Previous to that, I think, there were more sailings, yes.
Q. And what has accounted for the diminution of service?
A. As I said before, I think it is due to the lesser volume of cargo moving into these areas. I think there has been a greater industrialization in Latin Ameri-ca, and as a result it has affected some

posed contract and no contract, which, of course, was not the case.[50] What the Commission sought were specific answers to the following questions: What are the legitimate commercial objectives achieved by the present contract system, which objectives fairly detract from the weight of the loss of freedom of choice by the shipper? What transportation need is served by the present system? What important public benefits are secured by it? Is the present system imposed in furtherance of some valid regulatory purpose of the Shipping Act? J.A. 177. Petitioners, however, as the Commission noted, failed to provide satisfactory non-speculative answers.

■ We should bear in mind that the Commission did not disapprove of the dual rate contract concept, but merely placed limitations upon its use. Such action is clearly in accord with our national policy that only the least restrictive inroads into free competition will be tolerated.[51] Absent the protection of section 14b, the exclusive patronage tying system embodied in a dual rate contract would clearly run counter to the antitrust laws. Having failed to present sufficient evidence which detracts from the weight of this antitrust factor, we find the Commission's conclusion that petitioners' proposed dual rate contracts are contrary to the public interest to be based upon substantial evidence and, accordingly, affirm the Commission's order.

So ordered.

of the movement from the Pacific Coast of manufactured items. J.A. 167–68.

50. The Commission cites the following example:

Mr. M. J. McCarthy, of the Freight Forwarders Association, stated that he had been in the shipping business for 41 years, and that this present contract system "better affords stability of rates", and that without the present contract system there would be no rate stability. When Hearing Counsel asked whether the shipper should have the option of shipping conference or non-Conference, Mr. McCarthy stated:

## APPENDIX
### Section 14b of the Shipping Act

Notwithstanding any other provisions of this chapter, on application the Federal Maritime Commission (hereinafter "Commission"), shall, after notice, and hearing, by order, permit the use by any common carrier or conference of such carriers in foreign commerce of any contract, amendment, or modification thereof, which is available to all shippers and consignees on equal terms and conditions, which provides lower rates to a shipper or consignee who agrees to give all or any fixed portion of his patronage to such carrier or conference of carriers unless the Commission finds that the contract, amendment, or modification thereof will be detrimental to the commerce of the United States or contrary to the public interest, or unjustly discriminatory or unfair as between shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, and provided the contract, amendment, or modification thereof, expressly (1) permits prompt release of the contract shipper from the contract with respect to any shipment or shipments for which the contracting carrier or conference of carriers cannot provide as much space as the contract shipper shall require on reasonable notice; (2) provides that whenever a tariff rate for the carriage of goods under the contract becomes effective, insofar as it is under the control of the carrier or conference of carriers, it shall not be increased before a reason-

If you put it that way, Mr. Tell, forget about the Conference, just break them up and forget about it if you're going to give the latitude where he can ship conference or non-Conference. If he has that latitude, I see no reason why he should have a Conference. Why don't you walk right into a rate war? J.A. 170.

51. See Isbrandtsen Co. v. United States, 93 U.S.App.D.C. 293, 299, 211 F.2d 51, 57, cert. denied, Japan Atlantic and Gulf Conference v. United States, 347 U.S. 990, 74 S.Ct. 852, 98 L.Ed. 1124 (1954).

able period, but in no case less than ninety days; (3) covers only those goods of the contract shipper as to the shipment of which he has the legal right at the time of shipment to select the carrier: *Provided, however,* That it shall be deemed a breach of the contract if, before the time of shipment and with the intent to avoid his obligation under the contract, the contract shipper divests himself, or with the same intent permits himself to be divested, of the legal right to select the carrier and the shipment is carried by a carrier which is not a party to the contract; (4) does not require the contract shipper to divert shipment of goods from natural routings not served by the carrier or conference of carriers where direct carriage is available; (5) limits damages recoverable for breach by either party to actual damages to be determined after breach in accordance with the principles of contract law: *Provided, however,* That the contract may specify that in the case of a breach by a contract shipper the damages may be an amount not exceeding the freight charges computed at the contract rate on the particular shipment, less the cost of handling; (6) permits the contract shipper to terminate at any time without penalty upon ninety days' notice; (7) provides for a spread between ordinary rates and rates charged contract shippers which the Commission finds to be reasonable in all the circumstances but which spread shall in no event be more than 15 per centum of the ordinary rates; (8) excludes cargo of the contract shippers which is loaded and carried in bulk without mark or count except liquid bulk cargoes, other than chemicals, in less than full shipload lots: *Provided, however,* That upon finding that economic factors so warrant, the Commission may exclude from the contract any commodity subject to the foregoing exception; and (9) contains such other provisions not inconsistent herewith as the Commission shall require or permit. The Commission shall withdraw permission which it has granted under the authority contained in this section for the use of any contract if it finds, after notice and hearing, that the use of such contract is detrimental to the commerce of the United States or contrary to the public interest, or is unjustly discriminatory or unfair as between shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors. The carrier or conference of carriers may on ninety days' notice terminate without penalty the contract rate system herein authorized, in whole or with respect to any commodity: *Provided, however,* That after such termination the carrier or conference of carriers may not reinstitute such contract rate system or part thereof so terminated without prior permission by the Commission in accordance with the provisions of this section. Any contract, amendment, or modification of any contract not permitted by the Commission shall be unlawful, and contracts, amendments, and modifications shall be lawful only when and as long as permitted by the Commission; before permission is granted or after permission is withdrawn it shall be unlawful to carry out in whole or in part, directly or indirectly, any such contract, amendment, or modification. As used in this section, the term "contract shipper" means a person other than a carrier or conference of carriers who is a party to a contract the use of which may be permitted under this section.

46 U.S.C. § 813a (1970).

## Section 15 of the Shipping Act

Every common carrier by water, or other person subject to this chapter, shall file immediately with the Commission a true copy, or, if oral, a true and complete memorandum, of every agreement with another such carrier or other person subject to this chapter, or modification or cancellation thereof, to which it may be a party or conform in whole or in part, fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing,

or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement. The term "agreement" in this section includes understandings, conferences, and other arrangements.

The Commission shall by order, after notice and hearing, disapprove, cancel or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this chapter, and shall approve all other agreements, modifications or cancellations. No such agreement shall be approved, nor shall continued approval be permitted for any agreement (1) between carriers not members of the same conference or conferences of carriers serving different trades that would otherwise be naturally competitive, unless in the case of agreements between carriers, each carrier, or in the case of agreements between conferences, each conference, retains the right of independent action, or (2) in respect to any conference agreement, which fails to provide reasonable and equal terms and conditions for admission and readmission to conference membership of other qualified carriers in the trade, or fails to provide that any member may withdraw from membership upon reasonable notice without penalty for such withdrawal.

The Commission shall disapprove any such agreement, after notice and hearing, on a finding of inadequate policing of the obligations under it, or of failure or refusal to adopt and maintain reasonable procedures for promptly and fairly hearing and considering shippers' requests and complaints.

Any agreement and any modification or cancellation of any agreement not approved, or disapproved, by the Commission shall be unlawful, and agreements, modifications, and cancellations shall be lawful only when and as long as approved by the Commission; before approval or after disapproval it shall be unlawful to carry out in whole or in part, directly or indirectly, any such agreement, modification, or cancellation; except that tariff rates, fares, and charges, and classifications, rules, and regulations explanatory thereof (including changes in special rates and charges covered by section 813a of this title which do not involve a change in the spread between such rates and charges and the rates and charges applicable to noncontract shippers) agreed upon by approved conferences, and changes and amendments thereto, if otherwise in accordance with law, shall be permitted to take effect without prior approval upon compliance with the publication and filing requirements of section 817(b) of this title and with the provisions of any regulations the Commission may adopt.

Every agreement, modification, or cancellation lawful under this section, or permitted under section 813a of this title, shall be excepted from the provisions of sections 1–11 and 15 of Title 15, and amendments and Acts supplementary thereto.

Whoever violates any provision of this section or of section 813a of this title shall be liable to a penalty of not more than $1,000 for each day such violation continues, to be recovered by the United States in a civil action: *Provided, however,* That the penalty provisions of this section shall not apply to leases, licenses, assignments, or other agreements of similar character for the use of terminal property or facilities which were entered into before the date of enactment of this Act, and, if continued in effect beyond said date, submitted to

the Federal Maritime Commission for approval prior to or within ninety days after the enactment of this Act, unless such leases, licenses, assignments, or other agreements for the use of terminal facilities are disapproved, modified, or canceled by the Commission and are continued in operation without regard to the Commission's action thereon. The Commission shall promptly approve, disapprove, cancel, or modify each such agreement in accordance with the provisions of this section.

46 U.S.C. § 814 (1970).